924 F.2d 794
 Christopher A. RELLERGERT, a minor child of Mark Wayne
England, Deceased, by next friend, Melanie
RELLERGERT, Appellant,
v.
CAPE GIRARDEAU COUNTY, MISSOURI; Sheriff Norman Copeland;
and Deputy Paul Bedell, Appellees.
 No. 89-2862EM.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 10, 1990.
Decided Feb. 4, 1991.
 
 John L. Cook, Cape Girardeau, Mo., for appellant.
 A.M. Spradling III, Cape Girardeau, Mo., for appellees.
 Before BOWMAN and WOLLMAN, Circuit Judges, and FLOYD R. GIBSON, Senior Circuit Judge.
 FLOYD R. GIBSON, Senior Circuit Judge.
 
 
 1
 This case presents the issue of whether the measures taken by the defendants-appellees to prevent the suicide of an inmate were sufficient to afford them the protection of qualified immunity where they knew of the inmate's suicidal tendency and provided against it, but where the inmate did kill himself.
 
 I. BACKGROUND
 
 2
 Plaintiff-Appellant's putative father, Mark England, was paroled two months after being sentenced to a one-year prison term in Cape Girardeau County Jail for resisting arrest. A condition of his parole was that he maintain employment, which he did until he was laid off on June 17, 1987. His parole was immediately revoked, and he was back in jail the next day. While there is no evidence that England had problems during the time he was jailed prior to his parole, he indicated on a medical history form that he filled out upon his return to jail on June 18, 1987, that he had attempted suicide in the past. In light of this response, England was interviewed the next day by a social worker who concluded that England suffered from mild depression but did not have suicidal symptoms and was not in need of mental health treatment. No recommendations were made to the jail.
 
 
 3
 Nevertheless, pursuant to procedures implemented by the Sheriff's office to prevent inmate suicides--and presumably out of caution due to England's affirmative response to the suicide question--he was housed in a common area of the jail where he could be observed by a duty officer (defendant Bedell) from a centrally located booth in that area. Inmate cells and a shower and bathroom area are adjacent to the booth, but are not visible or otherwise monitored therefrom. We turn to the district court's[1] opinion for the remaining facts.
 
 
 4
 After midnight, the sheriff's personnel consists of the jailer in the booth, a radio dispatcher in the office area of the jail and at least one duty driver generally in a patrol vehicle. Additional personnel arrive at 7:00 a.m. each morning and are on duty until midnight. The jailer in the booth is directed never to leave the booth and in the event of emergency he calls the dispatcher in the facility for help. This procedure is designed for safety and to avoid escape or injury should a jailer leave the booth and possibly be overpowered by inmates.
 
 
 5
 Defendant Bedell came on duty at midnight on June 20, 1987 and assumed his post in the booth. At the time, England and another inmate were in the common area where Bedell continued to observe them. An hour or so later another prisoner was brought in by the duty officer on a driving-while-intoxicated charge. He, too, was placed in the common area. All other inmates were in cells with their doors locked.
 
 
 6
 Sometime after 3:00 a.m. while Bedell, in the booth, was processing the charge on the new prisoner, he observed England walk from the common area to the shower and bathroom. He did not return quickly and Bedell, while still in the booth, woke the second inmate in the common area and a trustee and sent them to the shower to check on England. The inmate and trustee went to the bathroom and returned quickly to state England had hung himself with a sheet in the bathroom area. The dispatcher was alerted and within ten or fifteen minutes, road personnel came in and confirmed the tragedy. Throughout the events, Bedell remained in the booth following jail procedures.
 
 
 7
 A followup investigation revealed that England had been assigned only one sheet for bedding in the common area. Nevertheless, he was able to obtain an additional sheet with which to hang himself. The collection of linens suggested no shortage so there was no definite evidence to suggest how England obtained the extra sheet. Bedell testified that as he observed England go to the bathroom, he could not see [whether] he carried a sheet or other bedding with him.
 
 
 8
 Rellergert v. Cape Girardeau County, Mo., 724 F.Supp. 662, 665 (E.D.Mo.1989).
 
 
 9
 Melanie Rellergert brought suit as next friend of Christopher Rellergert, minor child of England, against the county, the sheriff, and the booth deputy under 42 U.S.C. Sec. 1983 and Sec. 1988 for violation of England's constitutional rights under the Fifth, Eighth, and Fourteenth Amendments. The case went to the jury against only Sheriff Copeland and Deputy Bedell; the county had been dismissed earlier. The jury returned a verdict in favor of England's minor son for $75,000. The district court granted defendants' motion for JNOV on the grounds that they were entitled to qualified immunity. Rellergert appeals the grant of JNOV.
 
 II. DISCUSSION
 
 10
 The law of qualified immunity is especially susceptible to the adage that the law applied to hard facts yields unfortunate results. Though the concept behind the controlling law is simple, application of the law of qualified immunity necessarily depends on the facts of a given case. The fact-specific nature of the inquiry sometimes obscures the controlling legal principle, particularly where the facts are tragic. The tragedy of this case was not lost to the district court, nor to us, but the sometimes unhappy lot of judges requires us to see the law first and the tragedy second.
 
 
 11
 In the prison-suicide setting, qualified immunity protects jailers acting in their official capacity from bearing the expenses of judgment and the burdens of trial where an inmate or his survivors has failed to show, or cannot show as a matter of law, that his jailers have acted in deliberate indifference to the risk of his suicide. Deliberate indifference "is a difficult burden for a plaintiff to meet and becomes the key issue in this case." Popham v. City of Talladega, 908 F.2d 1561, 1563 (11th Cir.1990) (per curiam) (citing Edwards v. Gilbert, 867 F.2d 1271, 1274-75 (11th Cir.1989)). To provide its fullest and best use, qualified immunity ideally is addressed by summary judgment, but the defense can also be argued at trial and after judgment.
 
 
 12
 Generally, the deliberate indifference issue in inmate suicide cases arises under one of two broad fact situations. First is a suicide or attempt that occurs when jailers failed to discover the decedent's suicidal tendencies.[2] Second is a suicide or attempt that occurs when jailers have discovered the tendencies and have taken preventive measures.[3] The legal inquiry is the same in both sets of cases: whether the jailers were deliberately indifferent to the risk of suicide. This case falls within the second scenario, thus the question turns on the adequacy of the preventive measures.
 
 
 13
 It is deceivingly inviting to take the suicide, ipso facto, as conclusive proof of deliberate indifference. However, where suicidal tendencies are discovered and preventive measures taken, the question is only whether the measures taken were so inadequate as to be deliberately indifferent to the risk. The suicide is not probative of that question--we can conceive of cases wherein jailers are deliberately indifferent and yet the attempted suicide fails. Cf. Bell, 741 F.Supp. 1354 (fact question remained precluding summary judgment). Just as that failure would not disprove deliberate indifference on the part of the jailers, neither does a success prove it. In fact, tying the suicide to proof of deliberate indifference is tantamount to requiring jailers to provide suicide-proof institutions.
 
 
 14
 Whether or not the measures taken by jailers are sufficient to preclude a finding of deliberate indifference, thereby providing qualified immunity to the jailers, must be determined by considering the measures taken in light of the practical limitations on jailers to prevent inmate suicides. Evaluation of the measures cannot be made from an ex post facto perspective. Once a suicide has been accomplished in spite of preventive measures, it is all to easy to point out the flaws of failure. The proper consideration of the measures implemented by the jailers can only be from an objective point of view. While the jailers should learn from their failure to aid in the prevention of later suicides, we cannot fairly judge them by that failure.
 
 
 15
 Rellergert suggests the following view of jailers' efforts. Although England was under near-constant observation, he could not be physically restrained from killing himself. Thus, the jailers set-up England to kill himself--an unreasonable response to their constitutional duty. At oral argument, Rellergert's counsel characterized the preventive measures as doing everything but handing England a gun.
 
 
 16
 If that statement were true, it would be clear deliberate indifference. But the statement is not true; it is a gross mischaracterization of the facts and demonstrates our point that the search for blame or fault, particularly with the benefit of hindsight, can too easily infect what must be a dispassionate analysis. Simply laying blame or fault and pointing out what might have been done is insufficient. The question is not whether the jailers did all they could have, but whether they did all the Constitution requires. The requirement for defeat of a claim of qualified immunity is that the evidence demonstrate deliberate indifference by the jailers in the face of a known suicide risk at the time preventive measures were effected.
 
 
 17
 We must judge the evidence of the measures taken by Copeland and Bedell just as the trial court did in considering their motion for JNOV. Murray v. Leyshock, 915 F.2d 1196, 1198 (8th Cir.1990) (citation omitted). We give great credence to the jury verdict, giving it the benefit of all reasonable inferences and taking all the evidence tending to support the verdict. We will "sustain the district court only if all the evidence points one way and is not susceptible of any reasonable inferences supporting the jury's [verdict]." Hibbs v. K-Mart Corp., 870 F.2d 435, 438 (8th Cir.1989) (citation omitted).
 
 
 18
 We have considered the facts of this case vis-a-vis the many appellate decisions to which we have cited and others arising from inmate suicides. While we conclude that the law is clearly established that jailers must take measures to prevent inmate suicides once they know of the suicide risk, we cannot say that the law is established with any clarity as to what those measures must be. Because there are no hard and fast parameters and because each case turns on its own peculiar facts, we reach our holding under the generalized principles we have outlined and under the JNOV standard of review. Even under this exacting scrutiny, we nevertheless conclude that the defendants' efforts to prevent England's suicide cannot be said to have been known to them as deliberately indifferent to the serious risk he presented as a potential suicide.
 
 
 19
 We have considered the efforts of the defendants in two parts: the general policy of housing suicidal inmates in the common area and the particular conduct of Bedell the morning of England's suicide. As for the policy used by the Sheriff's office, we note that it represents affirmative and deliberate steps to prevent suicides by subjecting suicidal inmates to nearly constant watch. The policy could not have been both deliberately cautious about England's risk as a suicide and deliberately indifferent about it. Indifference is apathy or unconcern. The policy demonstrates the opposite; it was derived out of concern that inmates not commit suicide and implemented to prevent England's. That he was still able to succeed by obtaining the means of suicide and evading the cautious eyes of his jailers for a brief time does not change the value and import of the policy to the contrary. While the caution taken failed and while that failure might rise to negligence, no view of the evidence can support the conclusion that the policy was deliberately indifferent.
 
 
 20
 The evidence of Bedell's conduct presents a closer call, but one that still points entirely in a single direction--that his conduct was not deliberately indifferent to the risk England presented. Taking all reasonable inferences in support of the jury's verdict, the evidence demonstrates that Bedell let England out of his sight with a bedsheet when Bedell knew that England was on a suicide watch. The evidence tends to support the statement that Bedell had more conflicting responsibilities than he could successfully discharge in an emergency situation, as Bedell had other responsibilities to which he had to attend and as he could not leave the booth. Taking all this as true, the jury might reasonably conclude that Bedell acted imprudently, wrongly, or negligently. However, as a matter of law, we conclude that this evidence cannot permit the conclusion that Bedell acted with deliberate indifference.
 
 III. CONCLUSION
 
 21
 Because the measures taken by the defendants to prevent the suicide of England did not demonstrate deliberate indifference to his serious medical needs as a suicide risk, the defendants are entitled to qualified immunity from liability for the alleged deprivation of England's constitutional rights. For that reason, we affirm the district court's grant of JNOV to the defendants below.
 
 
 
 [1]
 The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern and Western Districts of Missouri
 
 
 [2]
 For examples, see Popham, 908 F.2d 1561; Burns v. City of Galveston, Tex., 905 F.2d 100 (5th Cir.1990); Belcher v. Oliver, 898 F.2d 32 (4th Cir.1990); Danese v. Asman, 875 F.2d 1239 (6th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1473, 108 L.Ed.2d 610 (1990); Edwards, 867 F.2d 1271; Colburn v. Upper Darby Tp., 838 F.2d 663 (3rd Cir.1988), cert. denied, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989); Gagne v. City of Galveston, 805 F.2d 558 (5th Cir.1986), cert. denied sub nom. Gagne v. Putnal, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987); Bell v. County of Washington County, Iowa, 741 F.Supp. 1354 (S.D.Iowa 1990) (appealed to this court)
 
 
 [3]
 For examples, see Buffington v. Baltimore County, Md., 913 F.2d 113 (4th Cir.1990); Lewis v. Parish of Terrebonne, 894 F.2d 142 (5th Cir.1990); Greason v. Kemp, 891 F.2d 829 (11th Cir.1990)