**Robert J. SWAN, Jr., by his next friend Matilda CARELLO, Matilda Carello on her own behalf and Ralph P. Carello, Jr., Plaintiffs,**

v.

**Aubrey DANIELS, ARA Health Services, a corporation of the State of Delaware, George Martino, William L. Hoosier, Bradley Lee, and Annette M. Newman, Defendants.**

Civil Action No. 94–221.

United States District Court,
D. Delaware.

June 28, 1995.

Douglas A. Shachtman, Douglas A. Shachtman & Associates, Wilmington, Delaware, for plaintiffs.

William W. Erhart, Wilmington, Delaware, for defendant Aubrey Daniels.

Michael I. Silverman, Tybout, Redfearn & Pell, Wilmington, Delaware, for defendant ARA Health Services.

Gregg E. Wilson, and J. Brendan O'Neil, Delaware Department of Justice, Wilmington, Delaware, for defendants George Martino, Bradley Lee, and William L. Hoosier.

Christopher J. Curtin, Sawyer & Akin, P.A., Wilmington, Delaware, for defendant Annette M. Newman.

**OPINION**

McKELVIE, District Judge.

This is a civil rights case. Robert Swan is a citizen of the State of Delaware. Matilda and Ralph Carello are Swan's mother and stepfather. On June 3, 1992, Swan attempted to commit suicide while detained at the Delaware Multi–Purpose Criminal Justice Facility, known as Gander Hill prison, in Wilmington, Delaware. In a complaint and amended complaint filed April 29, and June 3, 1994, respectively, Robert Swan, through Matilda and Ralph Carello, alleges defendants have violated his rights under the Eighth and Fourteenth Amendments by disregarding his serious medical needs and by failing to prevent his attempted suicide. In addition, plaintiffs assert claims for negligence and intentional infliction of emotional distress.

Defendants Aubrey Daniels and Annette Newman are correctional officers assigned to the infirmary at Gander Hill and on duty during the time of Swan's attempted suicide. ARA Health Services, Inc. ("ARA") is a corporation which had contracted with the Delaware Department of Corrections under the name Correctional Medical Services ("CMS") to provide medical and mental health services to prisoners at Gander Hill. At the times relevant to this suit, George Martino was the deputy warden, Bradley Lee was a correctional captain, and William Hoosier was a correctional staff lieutenant at Gander Hill. Each defendant denies that he or she violated plaintiffs' rights, and has moved for a summary judgment on all the claims in plaintiffs' complaint. This is the court's decision on defendants' motions.

*FACTUAL BACKGROUND*

The facts set forth below are culled from the papers, affidavits, and documents submitted by the parties in support of their motions, including the following materials: arrest report and commitment records of Robert Swan; Gander Hill receiving screening form; CMS medical progress notes; infirmary log book; investigative incident reports, internal memos, and hearing reports regarding Swan's attempted suicide; Department of Correction standard operating procedures; National Commission on Correctional Health Care prison operating procedures; CMS services contract with the Delaware Department of Correction; photographs of Gander Hill infirmary; partial deposition transcripts of Aubrey Daniels, Annette Newman, Brian Greenwell, George Martino, Matilda Carello; affidavit of Annette Newman. These facts are undisputed unless otherwise indicated.

On May 31, 1992, Robert Swan was arrested on charges of second degree assault and criminal impersonation. He was taken to Gander Hill prison and held there in lieu of $12,500 bond. At Gander Hill, Swan was brought to the booking and receiving area for intake purposes, where he was issued prison clothing and bedding, and was given an initial medical screening conducted by Nurse Jacqueline Saller. Questions 9 and 10 on the screening form ask: "Have you ever tried to kill yourself?" and "Are you thinking of killing yourself?" Swan answered "no" to both of these questions.

The next day, June 1, 1992, Swan was denied bail. Swan then called his mother, Matilda Carello, and informed her that he was not given bail and that he was going to kill himself. Carello immediately called Gander Hill to report her son's threat to commit suicide and was referred to the CMS Director of Mental Health, Kevin Free. Free directed prison personnel to bring Swan to the infirmary where CMS Mental Health Worker Sarah Marvian evaluated him. During this interview, Swan reported to Marvian that he had tried to kill himself about a year before, and she noted that he appeared "hopeless" as to his legal situation and "agitated and angry" regarding the incident that led to his arrest. Marvian consulted Dr. Antonio Sacre, a psychiatrist working for CMS, concerning her evaluation of Swan, and Sacre ordered that Swan be admitted to the infirmary and placed on full suicide status.

At approximately 4 p.m., CMS Nurse Arthur Zimmerman admitted Swan to the infirmary. In accordance with Gander Hill suicide prevention procedures, Swan was stripped of all his clothing and personal belongings except his underwear, and he was given a blanket without a nylon border. He was also scheduled to be checked on by prison personnel every 15 minutes.

After admitting Swan to the infirmary, Nurse Zimmerman assigned him to room number 198. This is a single person cell with a window on the back wall measuring approximately 7″ by 4′ with a metal bar running down the center and a narrow window in the door approximately 3″ by 12″. The room has no bed frame or mattress, nor any protrusions other than a combined sink and toilet. In addition to other cells similar to 198, the infirmary has two "Ram rooms," which are used to house both suicidal inmates and those who pose extreme security problems. These rooms have the same window and metal bar on the back wall, but have a 3′ by 4′ plexiglass window cut in the front wall, which allows better visibility into the room. In addition, these rooms do not contain a combined toilet/sink unit. The Gander Hill infirmary itself is a U-shaped room, with prisoner cells lining the outer edge, surrounding an interior, security module or control booth in the center. Correctional officers are stationed in this security booth, which contains the electric switches for opening doors and controlling access to the entire infirmary module.

Progress notes maintained by the CMS medical staff at Gander Hill for June 1, 1992, indicate that staff physician Dr. James Thomas examined Swan sometime after Swan's admission to the infirmary. In addition, CMS Nurse Fayetta Roberts examined Swan at 10 o'clock that evening. After each evaluation, Swan remained on full suicide watch. On June 2, 1992, CMS nursing staff evaluated Swan five times: at 7 a.m., again a few hours later, at 11 a.m., 2 p.m., and 10 p.m. These medical personnel maintained Swan's full suicide status throughout the day.

On June 3, 1992, the day Swan attempted suicide, all of the correctional defendants were on duty during the 8 to 4 shift. Deputy Warden Martino was the acting warden at that time; he did not directly supervise the inmates or the infirmary, but instead delegated responsibility for the daily operations of the prison to his subordinates. Captain Lee was the shift commander and handled the administrative paperwork and arrangements for the shift. Staff Lieutenant Hoosier was the overall shift supervisor.

In addition, Officer Newman was the module control officer for the Gander Hill infirmary during the 8 to 4 shift. As such, Newman was responsible for operating the electronic switches in the control room and unlocking the cell and infirmary doors for authorized people such as medical staff, correctional officers, inmates, and visitors. This duty required that she remain in the security module for most of her shift. Newman was also charged with maintaining a log book to document the activities that occur on the module. In this book, Newman would record head counts, changes in cell assignments, persons who enter and leave the infirmary, and other events such as security checks, cell shakedowns, distribution of medications, distribution and collection of meals, and inmate showers and recreation periods. Finally, Newman's duties included answering the telephone and completing the paperwork nec-

essary to admit or discharge an inmate from the infirmary.

On June 3, 1992, Officer Daniels was the roving "floor officer" assigned to the Gander Hill infirmary for the 8 to 4 shift. Daniels was responsible for patrolling the infirmary area outside the security module and performing physical checks on the inmates, such as security checks, random cell shakedowns, and suicide watch checks. In addition, he assisted the medical and correctional staff whenever a cell door needed to be opened for treatment, meals, recreation, etc.

The infirmary log book and medical progress notes provide a record of many of the events which occurred with regard to Robert Swan on June 3, 1992. At 7 a.m., Nurse Kamienski observed Swan in his cell and reported he was sleeping. Later that morning, Dr. Sacre examined Swan and continued his suicide watch. Officer Newman arrived at 7:58 a.m. to relieve the module control officer from the previous shift. During that debriefing, she was informed that there were five inmates, including Swan, on full suicide status, and she performed a security check of the entire area. At 8:10 a.m., Officer Daniels arrived on the infirmary floor to assume his duties. It appears from infirmary records that he performed his first security check at 9:03 a.m. At 9:43 a.m., all inmates on full suicide status were scheduled to receive recreation. Daniels states he asked Swan if he wanted to leave his cell at that time, and Swan answered that he did not. Daniels asserts also he spoke to Swan about how he was feeling and told him if he wanted to talk, he should tap on his door.

Officer Daniels performed another security check at 9:46 a.m., and Officer Newman made the next one at 10 a.m. At 10:30, Daniels conducted a window and bar check in each cell and a "shakedown" of three cells chosen at random. A shakedown consists of searching the inmate and the cell to insure the inmate does not possess any prohibited items. Swan's cell, room 198, was one of the cells Daniels shook down. At 10:37, Daniels made another security check, and at 10:45, all of the inmates on full suicide status who were out for recreation returned to their cells. At 11:34 a.m., Officer Newman performed a

head count. At 11:42 a.m., Nurse Zimmerman interviewed Swan and found that his medical and mental condition were stable, but left the suicide status in place. After this time, lunch was served and cleared. At 1:10 p.m., Daniels made a security check.

The parties are in dispute as to the following facts concerning the events immediately preceding Swan's attempted suicide and leading to the discovery of Swan in his cell. For purposes of clarity, the court will relate the facts as defendant Daniels describes them. Daniels states that around 1:20 p.m., he heard a noise which sounded like a person banging on a metal drum. He then searched the infirmary module and checked each cell, but could not locate the source of the noise. Daniels made a second inspection, at which time he encountered inmate worker Brian Greenwell, who reported that he did not hear any banging. Daniels checked on Swan during this sweep, and saw him standing with his back to the door, looking out the back window with his blanket draped over his shoulders. Upon returning to the control module, Daniels states that he telephoned the floor above the infirmary to ask about the noise, and was told it was not coming from there. Finally, Daniels made a third tour of the infirmary, and at 1:39 p.m., he found Robert Swan hanging in his cell with one end of his blanket tied to the vertical bar on the window and the other around his neck.

When Officer Daniels discovered Swan, he yelled to Officer Newman to open the cell door and bring the scissors. Newman activated the electrical switch to the cell, and inmate Greenwell held the door open while Newman brought Daniels a pair of scissors. Daniels cut Swan down and attempted to cut the blanket from around Swan's neck with the assistance of Nurse Zimmerman. Newman returned to the control module to call an infirmary nurse and Central Control to advise her superiors that an inmate had hung himself in the infirmary. Once they removed the blanket from Swan's neck, Officer Daniels and other medical staff performed CPR until the paramedics arrived at 1:57 p.m. to take Swan to Christiana Hospital. As a result of his attempted suicide, Swan was

placed on an artificial respirator for approximately 11 days, and remained in a coma for several weeks. He suffered permanent brain damage and requires the continuous attention and care of his mother and stepfather.

## PROCEDURAL HISTORY

On April 29, 1994, plaintiffs filed a four count complaint, asserting violations of the Eighth and Fourteenth Amendments, negligence, and intentional infliction of emotional distress. Docket Item ("D.I.") 1. On June 23, 1994, this court granted plaintiffs' Revised Motion For Leave To Amend Complaint, and plaintiffs filed an amended complaint. D.I. 24.

On September 28, 1994, in lieu of an answer, defendant Newman filed a motion for a summary judgment based on statute of limitations grounds. D.I. 84. On April 17, 1995, all defendants moved for summary judgment on the issues in plaintiffs' complaint. D.I. 208, 211, 215, 219. The parties completed their briefing on these motions by June 5, 1995, and on June 13, 1995, the court heard argument on the motions. For the following reasons, the court will grant a summary judgment in favor of each defendant as to plaintiffs' § 1983 claims. The court will reserve judgment as to plaintiffs' state claims.

## DISCUSSION

Federal Rule of Civil Procedure 56(c) authorizes a court to grant a summary judgment if it finds "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The Supreme Court has indicated that a court may grant a summary judgment either where it finds the facts in dispute not material or where it finds the dispute over the material facts does not raise a genuine issue. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is not genuine where no reasonable jury could find for the non-moving party under the appropriate burden of persuasion. *Id.*

I. *What Constitutional Standard Governs Defendants' Conduct?*

Plaintiffs' claims against defendants pursuant to 42 U.S.C. § 1983 stem from two possible sources: the Eighth Amendment, which applies to convicted prisoners, and the Fourteenth Amendment, which governs the government's obligations to pre-trial detainees. The parties are in dispute as to whether Swan was a pre-trial detainee or a convicted prisoner at the time of his attempted suicide. It is clear that Swan had not yet been tried on the assault and criminal impersonation charges for which he was being held at Gander Hill. However, at the time of his arrest, Swan should have been in state custody at the Department of Correction Plummer Center serving the remainder of a sentence for theft. Swan walked away from this work release program on May 3, 1992, and remained at large until he was arrested on May 31.

■ The court need not resolve the dispute as to Swan's correctional status in order to proceed, however, as the Third Circuit has determined that the level of protection afforded to prisoners by the Eighth and Fourteenth Amendments is the same. *Colburn v. Upper Darby Tp.*, 946 F.2d 1017, 1023 (3d Cir.1991); *Boring v. Kozakiewicz*, 833 F.2d 468, 472 (3d Cir.1987). Under either amendment, the Constitution is violated when a prison official acts with "deliberate indifference to a substantial risk of serious harm to an inmate." *Farmer v. Brennan*, —— U.S. ——, ——, 114 S.Ct. 1970, 1974, 128 L.Ed.2d 811 (1994); *see Colburn*, 946 F.2d at 1024.

II. *How Is "Deliberate Indifference" Defined?*

■ While the suicide of a prisoner "can support a recovery in a 42 U.S.C. § 1983 action," such claims "present[ ] difficult issues because no state actor directly inflicted harm" on the prisoner. *Colburn*, 946 F.2d at 1023. Instead, a plaintiff must show that prison officials were deliberately indifferent in failing to prevent the self-inflicted harm. The Supreme Court has recently undertaken to define the term "deliberate indifference." In *Farmer v. Brennan*, the Court stated that deliberate indifference exists where a prison official "knows of and disregards an excessive risk to inmate health or safety." —— U.S. at ——, 114 S.Ct. at 1978. Prior to the Court's ruling in *Farmer*, the Third Circuit had es-

tablished a similar standard in prisoner-suicide cases: the plaintiff has the burden of establishing "(1) the [prisoner] had a particular vulnerability to suicide, (2) the custodial officer or officers knew or should have known of that vulnerability, and (3) those officers acted with reckless indifference to the [prisoner's] particular vulnerability." *Colburn,* 946 F.2d at 1023. In light of the Court's holding in *Farmer* that a defendant must be subjectively aware of a substantial risk of harm, this court now reads element (2) of the Third Circuit's test to require a plaintiff to demonstrate that the custodial officer actually knew of the prisoner's vulnerability. *See Farmer,* —— U.S. at ——––——, 114 S.Ct. at 1979–80.

That Swan had serious suicidal tendencies and that defendants knew of this substantial risk of serious harm are not generally in dispute. In fact, upon learning of Swan's suicide threat from his mother and evaluating his mental state themselves, defendants placed Swan on full suicide status. Thus, in the context of resolving defendants' motions for summary judgment, the court must determine whether a reasonable jury could find that defendants' actions toward Swan constituted deliberate indifference to the substantial risk that he would attempt suicide.

█ Before turning to this task, the court recognizes "it is deceivingly inviting to take the suicide, ipso facto, as conclusive proof of deliberate indifference." *Rellergert v. Cape Girardeau County,* 924 F.2d 794, 796 (8th Cir.1991). However, in this case the issue is whether the measures taken by defendants to protect Swan "were so inadequate as to be deliberately indifferent," and Swan's attempted suicide "is not probative of that question." *Id.* The court is mindful of the Third Circuit's admonition that "[w]e cannot infer from the prisoner's act of suicide itself that the prison officials have recklessly disregarded their obligation to take reasonable precautions to protect the safety of prisoners entrusted to their care." *Freedman v. City of Allentown,* 853 F.2d 1111, 1114 (3d Cir. 1988); *see also Farmer,* —— U.S. at ——––——, 114 S.Ct. at 1982–83 (prison officials acting reasonably are not held liable under the Eighth Amendment "even if the harm

ultimately was not averted"). To do so would be "tantamount to requiring jailers to provide suicide-proof institutions," *Rellergert,* 924 F.2d at 796, whereas their duty under the Eighth Amendment is only "to ensure reasonable safety." *Farmer,* —— U.S. at ——, 114 S.Ct. at 1983.

With the above preface, the court will now evaluate the facts supporting plaintiffs' allegations of deliberate indifference as to each defendant in turn.

### III. *ARA Health Services, Inc. or "Correctional Medical Services"*

Plaintiffs assert that ARA Health Services, Inc. (hereinafter "CMS") was deliberately indifferent in its treatment of Swan and in the suicide prevention procedures it instituted at Gander Hill. The contract between CMS and the Department of Correction states that the medical services provided shall conform to the standard of care as established by the National Commission on Correctional Health Care ("NCCHC"), which calls for the double-bunking and constant supervision of suicidal inmates. Plaintiffs contend that CMS's apparent failure to follow this contractual standard amounts to deliberate indifference. In addition, plaintiffs allege CMS knew of other attempted suicides at Gander Hill, which should have indicated that their procedures were inadequate.

Furthermore, plaintiffs argue that CMS was deliberately indifferent in the specific treatment given to Swan. Plaintiffs cite to CMS's decision to put Swan alone in a cell instead of double-bunking him, and to put him in an ordinary infirmary cell, rather than place him in one of the infirmary's "Ram rooms." In addition, CMS staff did not place Swan under constant supervision, nor did they perform the 15 minute checks themselves. Finally, CMS staff allowed Swan to have a blanket.

CMS denies that the factual record in this case is sufficient to allow a reasonable jury to find that they were deliberately indifferent to Swan's medical and mental health needs. They contend the record demonstrates the contrary; that is, that their staff and suicide prevention procedures displayed great con-

cern for Swan's mental condition and physical welfare. CMS asserts that Swan's cell, number 198, was as "suicide-proof as possible," in accordance with NCCHC Standard P–58, and that it was necessary to give Swan a nylon blanket because he was wearing only a pair of boxer shorts in a cold infirmary cell. Finally, CMS argues the difference in medical opinion over the treatment that could have or should have been given does not constitute deliberate indifference.

■ In contracting with the Department of Corrections to provide prison medical services, CMS is bound by the State's obligations to its prisoners under the Eighth Amendment. *West v. Atkins*, 487 U.S. 42, 54–58, 108 S.Ct. 2250, 2258–60, 101 L.Ed.2d 40 (1988). However, CMS is not responsible for the constitutional violations of its employees, but will be liable only if its policies or procedures are unconstitutional or are the "moving force" behind the constitutional violation. *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 694–95, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978); *Colburn*, 946 F.2d at 1027–29. The policies must be so inadequate and ineffective such that the mere decision to employ them demonstrates deliberate indifference on the part of the policy-maker. The court notes that CMS is not liable under the Constitution simply for failing to follow a contractual standard of care it may have agreed upon with the State.

■ The facts surrounding CMS's application of its suicide prevention policies to Swan are undisputed. CMS medical staff evaluated Swan over ten times in two days. Nurse Zimmerman admitted him to the infirmary and Dr. Sacre placed him on full suicide watch, including checks every 15 minutes. In the infirmary, Swan was housed in a room with no protrusions, except arguably the vertical bar on the back window which was identical to that in the infirmary's "Ram rooms." Swan was stripped of all of his personal belongings, clothing, and any items CMS staff thought could be used to inflict self-harm. Swan was given only a pair of boxer shorts with no elastic band and a blanket with the nylon border removed.

After examining the evidence on CMS's policies and procedures regarding suicidal inmates, the court does not believe a reasonable jury could find that CMS was deliberately indifferent in this case. The suicide prevention practices at Gander Hill do not display a conscious disregard for the risks posed to the inmates; rather, they reveal a recognition of the potential risks and the implementation of reasonable measures to address these risks and protect the inmates. While the caution taken by CMS to protect Swan may have failed to prevent his suicide attempt, "no view of the evidence can support the conclusion that the policy was deliberately indifferent." *Rellergert*, 924 F.2d at 797. Nor were the procedures so meager and inadequate that CMS should have known they "would be ineffectual in preventing specific violations of constitutional rights." *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1071 n. 28 (3d Cir.1991). Thus, the court finds there is no genuine issue of material fact as to whether CMS's policies were tainted by deliberate indifference.

■ Additionally, plaintiffs argue that there were alternative treatment choices CMS medical staff could have selected such as double-bunking Swan, housing him in a different cell, and giving him a paper blanket. However, the presence of these options does not show that CMS was deliberately indifferent in the course of action it took, as "mere disagreements over medical judgments do not state Eighth Amendment claims." *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir.1990). Consequently, the court finds that no reasonable jury could infer that CMS was deliberately indifferent and will grant CMS's motion for a summary judgment on this issue.

IV. *George Martino, Bradley Lee, William Hoosier (the "Supervisory Defendants")*

Based on essentially the same evidence presented in support of their allegations against CMS, plaintiffs assert that the supervisory defendants created a situation which allowed Swan to attempt suicide, and they knew that such conditions existed. In addition to the arguments enumerated above con-

cerning the suicide prevention procedures at Gander Hill, plaintiffs contend the supervisory defendants were deliberately indifferent to the risk of harm posed to Swan because they made one infirmary "Ram room" unavailable by reserving it for security, and because two possible systems of recording the security checks made on suicidal inmates were not used or were unreliable. The first system, the "close observation checklist," consisted of the officer signing a sheet on each cell door after the check was made. Martino stated that use of this checklist had been abandoned for several years. The second system was the "watchtour system," whereby a correctional officer would register each security check with central control electronically by using a magnetic card. The supervisory defendants acknowledged that this method of logging checks often did not work properly and would not correctly record magnetic "punches" if the system was not cleared regularly.

■ In response, the supervisory defendants first argue that no facts exist from which a reasonable jury could find they had knowledge that Swan was in the infirmary on full suicide status or that there was a serious risk he would harm himself. However, it is not necessary that the prison officials knew specifically that Robert Swan was a suicidal inmate, but only that they were aware that a group of prisoners to which he belonged (suicidal inmates) faced a serious risk of harm caused by their deliberate indifference. *Farmer,* —— U.S. at ——, 114 S.Ct. at 1982.

Second, similarly to CMS, the supervisory defendants contend that rather than providing evidence of deliberate indifference, the suicide prevention policies in place at Gander Hill and the record of treatment and protection given to Swan show a concern for the risk of an attempted suicide and reasonable measures to abate the risk.

■ As with CMS, the court concludes that no reasonable jury could find the suicide prevention policies in existence at Gander Hill and applied to Swan demonstrate deliberate indifference on the part of the supervisory defendants. That additional preventative measures were available but not implemented does not affect the court's analysis of whether the defendants fulfilled "their obligation to take reasonable precautions to protect the safety of prisoners entrusted to their care." *Freedman,* 853 F.2d at 1114. Furthermore, the court finds the failure to utilize the watchtour and checklist methods of recording security checks is not evidence of deliberate indifference by the supervisory defendants, as these measures would not have increased the protection afforded to Swan against self-inflicted harm. Consequently, the court will grant a summary judgment in favor of the supervisory defendants on plaintiffs' § 1983 claim.

### V. *Officers Aubrey Daniels and Annette Newman*

Finally, plaintiffs assert claims against the officers working in the infirmary when Swan attempted suicide who were directly responsible for monitoring him and carrying out his suicide watch. Plaintiffs allege Officers Aubrey Daniels and Annette Newman failed to adequately perform their duties on that shift, in deliberate indifference to the serious risk of harm Swan faced. The crux of plaintiffs' argument is that Daniels did not make security checks on Swan every 15 minutes, as required by the Gander Hill suicide prevention procedures, and that Newman did not make the checks herself nor report Daniels' failure to her superiors so that this situation could have been rectified. Plaintiffs contend this conduct satisfies the constitutional standard of deliberate indifference.

The parties are in dispute as to the quantity and timing of the security checks conducted on June 3, 1992. The infirmary log book, maintained by Officer Newman, shows that between 8 a.m. and 1:30 p.m., Daniels made four security checks and Newman made three (including one head count). In addition, the "watchtour" electronic log for that time period shows three magnetic punches, indicating three security checks. Thus, plaintiffs assert that defendants conducted only 9 or 10 out of the required 18 security checks during their shift. In fact, plaintiffs note that, in their internal investigations of the incident, Lt. Francis Gudzelak, Lt. Janice Morris, and Captain Bradley Lee found Daniels and Newman were "negligent" in failing

to perform the security checks and punches every 15 minutes as prison policy dictated. Prison administrators initially sanctioned both defendants with a three-day suspension without pay for the negligent performance of their duties, although Warden Elizabeth Neal later dismissed Newman's sanction.

Defendants allege they performed additional checks during their shift which Officer Newman inadvertently did not record in the log book because she was too busy with her other duties at the time. They also allege that several of the magnetic punches they made did not register due to the faulty system. Records reflect that Officer Newman called central control more than four times to confirm that their punches had registered. Daniels contends he did not make the security checks at exact 15 minute intervals so that the prisoners would not be able to ascertain his pattern and anticipate his arrival. Furthermore, defendants assert that the investigating prison officials did not conclude that defendants had not performed the security checks at all, but rather that they were not performed in accordance with the prison regulations; that is, checks were not done every 15 minutes and were not properly documented in the log book and by the magnetic punch system.

The facts relating to Daniels' conduct between 1:10 and 1:39 p.m., when he discovered that Swan had attempted suicide, are also in dispute. Daniels states he heard a banging noise around 1:20 and he made three inspections of the infirmary to determine the source. On the second sweep, he saw Swan standing in his cell with his blanket around his shoulders, looking out the back window. On his third tour, approximately 5 minutes later, Daniels states he found Swan hanging in his cell. According to Officer Newman, Daniels had just completed a security check when they heard a banging noise coming from the floor above the infirmary. Daniels called the control module upstairs to inform them of the noise, and then swept the infirmary floor again to investigate. On this tour, Daniels found Swan and instructed Newman to open his cell door. Finally, in his deposition, inmate worker Brian Greenwell indicated that he was cleaning the infir-

mary and mopping the dialysis room during the time period in question. He stated that between 1:00 and 1:30 p.m., he saw Officer Daniels come back from the front of the infirmary with what looked like a cup of coffee in his hand. During this period, he also saw Swan standing in his cell looking out the door window into the infirmary. Greenwell testified that around 1:30, he heard a banging noise and saw Daniels exit the module control booth to investigate. Daniels asked Greenwell if he knew who was responsible for the banging and then began to check the infirmary cells. When Daniels reached room 198, he discovered Swan hanging and called to Greenwell to assist him.

Plaintiffs argue Daniels and Newman performed no security checks between 1:10 and 1:39 p.m., as the log book does not contain a record of any. Plaintiffs suggest Daniels created his story regarding the three checks he performed immediately prior to finding Swan. They assert Daniels' story conflicts with the statements of Newman and Greenwell and also is inconsistent with the police report and incident report completed the afternoon of June 3, 1992. These reports make no mention of Daniels' three tours of the infirmary between 1:10 and 1:39, and in fact, in his own incident report, Daniels states he was conducting a routine security check when he discovered Swan. Plaintiffs further note that Inmate Greenwell stated he observed Daniels leave the infirmary for a short period of time and return with a cup in his hand, such that Greenwell assumed Daniels had gotten a cup of coffee.

 While a court may not grant summary judgment if it determines that genuine issues of material fact exist, the court finds that the disputes as to the above questions of fact are not material to the issue of whether defendants violated the Constitution. Even accepting all of plaintiffs' allegations as to defendants' conduct during their shift on June 3, 1992 and the performance of security checks during that day as true, the court finds the record does not contain evidence from which a reasonable jury could conclude defendants acted with deliberate indifference.

Plaintiffs argue that because Daniels and Newman failed to properly carry out the

suicide prevention procedures required by the Gander Hill administration, they displayed deliberate indifference to the serious risk that Swan would harm himself. However, the constitutional standard of deliberate indifference is not defined with respect to whether or not prison procedures were completely satisfied. Furthermore, prison officials who strive to provide a level of protection higher than that mandated by the Constitution should not be penalized simply because these goals are not met.

Rather, the court must determine whether the record contains evidence that would support the finding that Daniels and Newman knew of Swan's suicidal tendencies and "ignored their responsibility to take reasonable precautions" to ensure his safety. *Freedman*, 853 F.2d at 1115. The Supreme Court has stated that "prison officials who act reasonably cannot be found liable" under the Eighth Amendment. *Farmer*, —— U.S. at ——, 114 S.Ct. at 1983. The record indicates that both Officers Daniels and Newman were busy throughout their shift on June 3, 1992 performing their various duties, which included making security checks on suicidal prisoners. While they may not have conducted a check every 15 minutes, and while the failure to do so might rise to the level of negligence, the facts do not support the conclusion that missing a number of checks during the day constitutes deliberate indifference. *See Gordon v. Kidd*, 971 F.2d 1087, 1095 (4th Cir.1992); *Rellergert*, 924 F.2d at 797; *Freedman*, 853 F.2d at 1116; *Snyder v. Baumecker*, 708 F.Supp. 1451, 1461 (D.N.J. 1989). As the Eighth Circuit has stated, "[i]ndifference is apathy or unconcern." *Rellergert*, 924 F.2d at 797. Nothing about Daniels' and Newman's conduct toward Swan could be found to demonstrate the kind of callous disregard for his safety necessary to prove deliberate indifference. Consequently, the court will grant a summary judgment in favor of defendants Daniels and Newman.

*CONCLUSION*

Although Swan's attempted suicide presents a tragic story, the Constitution does not require the State to provide suicide-proof prisons and this court cannot impose such a burden. It may well be that defendants could have done more to prevent Swan's suicide attempt. However, the court finds that no evidence exists from which a reasonable jury could conclude that the defendants were deliberately indifferent to Swan's serious risk of substantial harm. Thus, the court will grant a summary judgment in favor of all the defendants as to plaintiffs' claims pursuant to 42 U.S.C. § 1983. The court will reserve decision on defendants' motions as to plaintiffs' state claims, and will defer issuing an Order in accordance with this Opinion pending further discussion with the parties.