# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-1255

_____

Lois M. Gregoire, Special &ast; \
Administrator of the Estate of &ast; \
George Raymond Bouska; &ast; \
Wendy Bouska, Guardian Ad Litem &ast; \
for Jusenda Bouska, Serren Bouska &ast; \
and Shea Bouska, &ast; \
&ast;

        Plaintiffs/Appellees &ast; \
&ast;

    v. &ast; \
&ast;

Joseph Class, in his official capacity &ast;  On Appeal from the United \
as Warden of the South Dakota State &ast;  States District Court for the \
Penitentiary; &ast;  District of South Dakota. \
&ast;

        Defendant, &ast; \
&ast;

Douglas Weber, in  his official capacity &ast; \
as Warden of the South Dakota State &ast; \
Penitentiary and in his individual &ast; \
capacity as former Associate Warden &ast; \
of the South Dakota State Penitentiary; &ast; \
Dean Hinders, in his individual &ast; \
capacity as former Associate Warden &ast; \
of the South Dakota State Penitentiary; &ast; \
Steven Lee, in his official capacity and &ast; \
in his individual capacity as Deputy &ast; \
Warden of the South Dakota State &ast; \
Penitentiary; Butch Joffer, in his &ast;

individual capacity as a former            *
employee of the State of South Dakota,     *
                                           *
      Defendants/Appellants,            *
                                           *
Owen Spurrell, in his official capacity    *
as Associate Warden of the South           *
Dakota State Penitentiary; Jane and        *
John Doe, in their individual and          *
official capacities as employees of the    *
State of South Dakota,                     *
                                           *
      Defendants.                        *

_____

Submitted:  October 19, 2000

Filed:  December 29, 2000

_____

Before BEAM , HANSEN, and MORRIS SHEPPARD ARNOLD, Circuit Judges

_____

BEAM, Circuit Judge.

Appellant Butch Joffer appeals from the judgment denying his qualified immunity claim in this 42 U.S.C. § 1983 action.  The remaining appellants appeal from the exercise of supplemental jurisdiction over the state-law claims against them.[1]  We reverse and remand.

In reviewing this denial of summary judgment based on a qualified immunity claim, we view the facts in the light most favorable to the estate of George Raymond

---

[1]The procedural history tracing the various claims and parties involved in this action are described fully in the district court opinion.

Bouska, the nonmoving party. On June 11, 1994, while incarcerated at the South Dakota State Penitentiary (SDSP), Bouska committed suicide. Butch Joffer was a case manager in Bouska's cell block at SDSP. As a case manager, Joffer was in charge of about 200 prisoners whom he helped with parole reviews, prisoner classifications, and disciplinary hearings.

Although there are some minor discrepancies in the record about the exact time of events on June 11, the basic facts are undisputed. At approximately 10:30 a.m. on June 11, Bouska asked Joffer if he could make a phone call. After checking the list of authorized users, and finding Bouska not on it for that day, Joffer denied the request. Around noon, Bouska placed an unauthorized phone call to his ex-wife, Wendy Moran. During the phone call Bouska told Moran that he was going to kill himself. He also refused to talk to his daughters which led Moran to believe he was not just making an idle threat.

After taking a moment to collect herself and find the telephone number of the penitentiary, Moran phoned SDSP in order to warn prison officials. The call was received at approximately 12:19 p.m. and it took roughly five minutes for the main operator to transfer the call to Joffer. Moran told Joffer that Bouska was going to kill himself, and that she wanted Joffer to check on him and reassure Bouska that she would not prevent him from seeing his daughters. Moran did not mention that Bouska had made previous suicide threats, that he had been treated for depression, nor that he had allegedly attempted suicide in the past.

After hanging up the phone, Joffer wrote out a brief report and pulled Bouska's case file. Joffer believed that Moran was more concerned that Bouska understand he could continue to see his daughters than about the threat of suicide. Before telling Bouska he could see his daughters, Joffer wanted to ensure that Bouska's conviction was not for a sex offense against his children. Also during this time, several inmates

stopped in Joffer's office, which is on the cell block and accessible to inmates when they are out of their cells.

Around, or shortly after 1:05 p.m. Joffer had Bouska paged to come to his office. At approximately 1:12 p.m. Bouska's cellmate returned to the cell and found that Bouska had hung himself. Bouska still had a faint pulse at this time. Emergency medical personnel were called, but their efforts to save Bouska failed and he was pronounced dead around 1:40 p.m.

When he was initially transferred to SDSP on March 11, 1994, Bouska's health screening form noted that he was currently being treated for depression, had been hospitalized for it in February of 1994, and had recently contemplated suicide. It also appears Bouska was placed on suicide watch for two days at that time. On March 14, 1994, a Psychology Intake Interview Summary was prepared regarding Bouska. Again, it noted his current treatment for depression and recent suicidal ideation. However, the summary indicated Bouska was not a current risk for suicide and that he should be able to adjust to the institution provided he sought help for depression if it recurred.

In her deposition, Moran stated that during arguments throughout their relationship Bouska frequently threatened suicide. She also stated that approximately one month before his suicide, Bouska confided in her that while incarcerated he had attempted suicide by trying to hang himself, but had failed. She did not notify prison officials about this suicide attempt.

Joffer's case file on Bouska contained no mention of previous suicide threats or attempts or the fact that he was briefly placed on suicide watch. Nor did it contain medical or mental health information, information from Bouska's health screening form, or Psychology Intake Interview Summary. The only information Joffer had about the risk of Bouska's suicide was the phone call from Moran on June 11.

-4-

## A.    Qualified Immunity

We review a grant or denial of summary judgment by a district court de novo. Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992).  We construe the facts in a light most favorable to the nonmoving party.  Williams v. Kelso, 201 F.3d 1060, 1064 (8th Cir. 2000) (citing Anderson v. Liberty Lobby, 477 U.S. 242 (1986)). "[I]f there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment."  Lambert v. City of Dumas, 187 F.3d 931, 935 (8th Cir. 1999).  Because no such dispute exists in this case, the question of whether qualified immunity is proper is a question of law.  Id.

In balancing the need to vindicate constitutional violations by government officials who abuse their offices with the need to protect officials from the expense of frivolous suits that would unduly inhibit them in discharging their duties, the Supreme Court has carved out a qualified immunity doctrine to shield officials in the exercise of their discretionary functions.  In short, an official is protected by qualified immunity so long as "their actions could reasonably have been thought consistent with the rights they are alleged to have violated."  Anderson v. Creighton, 483 U.S. 635, 638 (1987).

To overcome this qualified immunity, the plaintiff must "assert a violation of a constitutional or statutory right; that right must have been clearly established at the time of the violation; and, given the facts most favorable to the plaintiff, there must be no genuine issues of material fact as to whether a reasonable official would have known that the alleged action indeed violated that right."  Liebe v. Norton, 157 F.3d 574, 577 (8th Cir. 1998).

The first two parts of this inquiry present no hurdle to the present appellee.  It is well established that the Eighth Amendment prohibition on cruel and unusual punishment extends to protect prisoners from deliberate indifference to serious medical needs.  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  It was also well established on

June 11, 1994, that a risk of suicide by an inmate is a serious medical need. See Rellergert v. Cape Girardeau County, 924 F.2d 794 (8th Cir. 1991).

Before embarking on the fact specific analysis required under the third part of the above qualified immunity inquiry, the deliberate indifference standard in prison medical needs cases requires some further attention. The Supreme Court has likened deliberate indifference to a criminal recklessness standard, which traditionally has contained a subjective component. Farmer v. Brennan, 511 U.S. 825, 839-40 (1994). Under this standard, an official is deliberately indifferent (reckless) if he disregards a known risk to a prisoner's health. Id. at 837. To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk, a plaintiff must establish that the official in question did in fact know of the risk. Id. However, this knowledge is subject to proof by all the usual ways, including inferences based on the obviousness of the risk. Id. at 842. Lastly, even if an official knows of a risk, he is not liable for a subsequent injury if he responded reasonably to the known risk. Id. at 844.

With this standard in mind, we turn to the facts of this case. To determine whether Joffer could have reasonably believed his actions did not violate Bouska's Eighth Amendment rights, we must first determine what Joffer knew about Bouska's risk of suicide. The only indication Joffer ever received that Bouska was a suicide risk was the phone call from Moran. There are no allegations or indications from the record that Joffer knew of Bouska's previous classification as a suicide risk, of his hospitalization and treatment for depression, of his alleged earlier suicide attempt, or of his numerous and frequent threats of suicide while married to and living with Moran.[2] Therefore, the only fact concerning Bouska's suicide risk which Joffer knew

[2]The fact that none of this was in Bouska's case file, particularly facts about past treatment for depression and suicidal ideation and about previous recent classification as a suicide risk, may raise concerns about the adequacy of procedures at the prison for discovering and preventing suicide risks. However, that does not change the fact that

-6-

of, and thus relevant to evaluating Joffer's conduct, was the phone call from Moran. See Farmer, 511 U.S. at 837 (holding that deliberate indifference is judged only on factors the official actually knew).

If an official completely disregarded a phone call such as Moran's, alerting the official to a suicide risk, such act may well constitute deliberate indifference.[3] However, Joffer did take some action to respond to the risk. Even if an official knows

unless there is some indication that Joffer in fact knew about these things, or that they were so obvious or otherwise subject to a reasonable inference that a fact-finder could make about Joffer's knowledge of them, they are irrelevant in an evaluation of his conduct. There is no such indication here.

[3]In Joffer's deposition, he indicated the phone conversation did not leave him with the impression that Bouska was a suicide risk. Rather, he thought Moran was more concerned about telling Bouska that she would not prevent him from seeing his children. This creates a potential fact question about whether Joffer in fact drew the inference about suicide risk, evidence of which is required under the deliberate indifference standard in Farmer, and/or whether the phone call from Bouska's wife made the risk so obvious or otherwise presented information from which a fact-finder could infer knowledge of the risk. We do not directly address this question for two reasons. First, it is unnecessary to our decision since we find that Joffer's response to any risk that could be inferred from the phone call was such that a reasonable official could have thought it consistent with Bouska's rights (e.g., not deliberately indifferent). Second, we recognize some tension between the subjective component of the deliberate indifference standard created in Farmer, and the Supreme Court's abandonment of a subjective malice component in qualified immunity determinations in Harlow v. Fitzgerald, 457 U.S. 800 (1982). The Supreme Court in Harlow eliminated the subjective element of the qualified immunity defense because it created a fact issue that made it difficult to grant qualified immunity at the summary judgment stage, and undercut the goal of lessening the burden on officials in having to defend against suits. The prudent course, is to avoid the more fact-dependent subjective element, and to focus first on the more objective elements in these cases, such as whether the conduct of the officials was deliberately indifferent in light of any inferences that could be drawn from the facts before them, and deciding on that basis if possible.

of a risk of suicide, and suicide does occur, the official is entitled to qualified immunity if he could reasonably believe that his response to the risk was not deliberately indifferent (or reckless) to that risk. See Anderson, 483 U.S. at 638; Estelle, 429 U.S. at 106 (holding that negligence in diagnosing, treating, or responding to a known medical condition does not state an Eighth Amendment violation, only deliberate indifference to serious medical needs violates the Eighth Amendment). It is on this point that Joffer is entitled to qualified immunity.

In evaluating an official's response to a known suicide risk, we should be cognizant of how serious the official knows the risk to be. Our cases indicate that a single phone call to an official who has no other reason to think an inmate is a suicide risk, most likely does not create a strong likelihood that infliction of self-harm will result. Cf. Bell v. Stigers, 937 F.2d 1340, 1344 (8th Cir. 1991) (stating "[a] single off-hand comment about shooting oneself when no gun is available cannot reasonably constitute a serious suicide threat");[4] Lambert, 187 F.3d at 938 (stating that knowledge of a single incident of attempting to swallow a crack pipe three years previous did not give rise to knowledge of a present serious risk of suicide).[5]

Prior to the phone call from Moran, Joffer had no reason to believe that Bouska was a suicide risk, and there is nothing to suggest he did in fact believe Bouska was a

---

[4]Bell used an objective standard to judge deliberate indifference. As mentioned, the Supreme Court in Farmer clarified that deliberate indifference should be judged according to a subjective standard. This difference in standards does not affect the point for which we cite Bell here .

[5]We recognize that both in Bell and in Lambert the court granted qualified immunity because the information known by the officials was not enough to create knowledge of an excessive or serious risk of suicide and thus was legally insufficient to satisfy the subjective knowledge component of the deliberate indifference standard. However, we do not decide if Moran's phone call to Joffer was sufficient to create knowledge of a serious risk of suicide for the reasons expressed in footnote 3.

suicide risk. After the phone call, Joffer pulled Bouska's file to determine what he could tell Bouska about seeing his children, wrote a short report about the phone call, and dealt with a few other prisoners who stopped into his office before trying to locate Bouska. Had Joffer known of Bouska's previous history of suicidal ideation, and the fact he had been on suicide watch for a few days, a quicker attempt to locate Bouska may have been warranted. However, since the only indication of risk was one phone call from Moran saying Bouska was going to kill himself, and that she wanted to assure Bouska she would not prevent him from seeing his children, we cannot characterize Joffer's subsequent actions as deliberately indifferent. They are at most negligent. See Williams, 201 F.3d at 1065 (holding that even if instructions were to check vital signs of inmate every four to six hours, failure to check them over seven hours does not constitute deliberate indifference); Liebe, 157 F.3d at 578 (finding that even if prison official was negligent in not checking suicidal prisoner more often than every seven to twenty minutes, in failing to notice exposed conduit cable and in failing to turn on the audio feed from the cell, this conduct could not be characterized as deliberately indifferent).

In hindsight it may have been preferable if Joffer had immediately sent someone to check Bouska. However, we must evaluate his actions in light of the information he possessed at the time, the practical limitations of his position and alternative courses of action that would have been apparent to an official in that position.[6] Cf. Rellergert, 924 F.2d at 796. "The question is not whether the jailers did all they could have, but whether they did all the Constitution requires." Id. at 797. While we expect that jailers will learn from their failures in preventing suicide, they are not constitutionally liable

---

[6]Appellant cites Liebe for the proposition that in evaluating whether an official was deliberately indifferent to a known risk, a court should focus on the actions taken and not on the actions that could have been taken. We believe this is simply another way of stating that one should not judge an officer's actions with the benefit of perfect hindsight. However, we do not find it inappropriate to consider all relevant factors in judging official conduct, including other possible courses of action.

for every failure, only those where they are deliberately indifferent to the risk of suicide. Id. at 796. Accordingly, we reverse the district court on the issue of qualified immunity.

**B.     Supplemental Jurisdiction**

Under 28 U.S.C. § 1367, in any civil action in which the district courts have original jurisdiction, they shall also have supplemental jurisdiction over all other claims so related to the claims in the original jurisdiction that they form part of the same case or controversy. Once claims over which a district court has original jurisdiction are dismissed, it is left to the court's discretion whether to exercise supplemental jurisdiction. 28 U.S.C. § 1367(c)(3). If the claim giving original jurisdiction is dismissed early in the action, "before any substantial preparation has gone into the dependent claims, dismissing or remanding the [state claims] upon declining supplemental jurisdiction seems fair enough." 28 U.S.C.A. § 1367 cmt. at 835 (1993).

This court has recently noted that, "when state and federal claims are joined and all federal claims are dismissed on a motion for summary judgment, the state claims are ordinarily dismissed without prejudice to avoid needless decisions of state law . . . as a matter of comity." ACLU v. City of Florissant, 186 F.3d 1095, 1098-99 (8th Cir. 1999) (internal quotations omitted). This court's statement in 1990 is as true today as then: "[t]he judicial resources of the federal courts are sparse compared to the states. We stress the need to exercise judicial restraint and avoid state law issues wherever possible." Condor Corp. v. City of St. Paul, 912 F.2d 215, 220 (8th Cir. 1990).

We remand to the district court to exercise its discretion in determining whether to exercise its supplemental jurisdiction over the remaining state law claims. The district court may find that the above considerations warrant allowing the South Dakota state courts to decide the state law issues.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.