**ESTATE OF Michael CILLS, Plaintiff,**

v.

**Stephan KAFTAN, The Cumberland County Department of Corrections, Captain Troll, Lieutenant Butler, Sergeant Frank Jones, Corrections Officer Vandel Lee, Corrections Officer Wharton, Juanita Nazario, Mary Ridgeway, John Doe, Corrections Officers, Robert Roe Supervisor, Mary Doe Nurses, and David Doe Jail Doctor, Defendants.**

Civil Action No. 98–3315 (JAP).

United States District Court,
D. New Jersey.

June 29, 2000.

Louis M. Barbone, Arthur J. Murray, Jacobs & Barbone, P.A., Atlantic City, NJ, for Plaintiff.

Richard J. Geiger, Davidow, Sherman, Eddowes & Geiger, Bridgeton, NJ, for Defendants Cumberland County Dept. of Corrections and Stephan Kaftan.

Arnold Robinson, Robinson & Kavanagh, LLC, Millville, NJ, for Defendants Trull, Butler, Jones, Lee, Wharton, Nazario and Ridgeway.

1. Plaintiff's complaint incorrectly refers to Captain Trull as Captain Troll.

2. The parties have, by consent, dismissed Corrections Officer Vandel Lee as a named defendant.

**OPINION**

PISANO, District Judge.

Pending before the Court are motions for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed.R.Civ.P.") 56 filed separately by defendants Cumberland County Department of Corrections ("Department") and Stephan Kaftan ("Warden Kaftan"), and the remaining known defendants, Captain Trull,[1] Lieutenant Butler, Sergeant Frank Jones, Corrections Officer Vandel Lee,[2] Corrections Officer Wharton, Juanita Nazario and Mary Ridgeway[3] (collectively, "Low–Level Employees"). Plaintiff filed opposition, and the Court decides the motions without oral argument pursuant to Fed.R.Civ.P. 78. Based on the reasons set forth below, the Court denies the motion for summary judgment filed by the Department and Warden Kaftan, and grants the motion for summary judgment filed by the Low–Level Employees.

### INTRODUCTION

This action, filed pursuant to 42 U.S.C. § 1983 and New Jersey common law, arises from a jail suicide. Pamela Bylone, the mother and administratrix of the estate of Michael Cills ("Cills"), an inmate who committed suicide at the Cumberland County Jail ("Jail") on September 21, 1996, prosecutes this action against the Department and a number of Department employees. The crux of the case is that the Department adopted an allegedly unconstitutional suicide policy that did not require Department employees to consult a mental health professional on the propriety of a decision to remove an inmate from suicide watch, and that certain Department employees allegedly violated Cills' constitutional rights to adequate medical care and personal security by removing him from

3. The parties have, by consent, dismissed Mary Ridgeway as a named defendant and have substituted Eunice Jenkins as a properly named defendant.

suicide watch, despite knowing that he was likely to commit suicide. Plaintiff filed a three-count complaint[4] on July 14, 1998, and the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

In support of their motion for summary judgment, the Low–Level Employees argue that plaintiff has failed to set forth sufficient evidence to support a claim that they were deliberately indifferent to Cills' medical and security needs, and, thus, there was no constitutional deprivation. Plaintiff contends that there is a genuine issue of material fact as to whether the Low–Level Employees' decision to remove Cills from suicide watch was made with the knowledge that Cills was substantially likely to kill himself. The Court finds that the Low–Level Employees are entitled to summary judgment because none of these defendants acted in a manner that constitutes deliberate or reckless indifference.

The Department and Warden Kaftan move for summary judgment on the ground that plaintiff has failed to establish that any alleged constitutional violation was the result of an official custom or policy upon which municipal liability can be sustained. Plaintiff asserts that the Department's verbal suicide policy, which was created by Warden Kaftan, constitutes a policy upon which municipal liability can be based. Because the Court finds that a genuine issue of material fact exists as to whether the Department's suicide policy was unconstitutional, and whether Cills suffered a constitutional deprivation as a result, summary judgment in favor of the Department and Warden Kaftan is denied.

4. The final count of the complaint alleged common law negligence and was dismissed because plaintiff failed to provide proper notice pursuant to the New Jersey Tort Claims Act. *See* N.J.S.A. 59:8–8. Only counts one and two which allege causes of action under 42 U.S.C. § 1983 remain.

## STATEMENT OF FACTS

### A. Cills' Incarceration

The following events precipitated this action.[5] On May 13, 1996, pursuant to a negotiated plea agreement, Michael Cills, a twenty year-old man, pled guilty in the New Jersey Superior Court, Law Division, to third-degree possession of Valium, in violation of N.J.S.A. 2C:35–10a(1). On June 14, 1996, Cills was sentenced to sixty days in the Jail and three years of probation.[6] On August 21, 1996, Cills began to serve his term of incarceration.[7]

### B. The Decision to Place Cills on Suicide Watch

On August 27, 1996, Cills drank cleaning fluid and was taken to Bridgeton Hospital for medical treatment. Although Cills claimed to have mistaken the liquid for orange juice, Department employees and Cills' mother viewed the event as a suicide attempt. (Pamela Bylone Deposition ("Bylone Dep.") at 36–37). Cills had a history of depression and attempted suicide dating back to 1986 when his father was killed in a car accident. (*Id.* at 18). Cills had also developed substance abuse problems. (*Id.* at 23, 28–30, 43–44). Prior to his incarceration, Cills had received extensive outpatient psychiatric treatment and occasional inpatient treatment for his depression and suicidal tendencies. (*Id.* at 19, 35–36).

Juanita Nazario ("Nazario"), a social worker who was the Department's supervisor of social services, knew of Cills' troubled history through conversations with his mother and counselors who had treated him. (Juanita Nazario Deposition ("Nazario Dep.") at 119–23). Eunice Jenkins ("Jenkins"), the Department's nursing su-

5. The facts are presented in a light most favorable to plaintiff, the non-movant. All facts are undisputed unless otherwise stated.

6. Cills received seventeen days of prior custody credit.

7. Cills' scheduled release date was October 7, 1996. (Complaint at ¶ 15).

pervisor, also became aware of Cills' history since she had access to his medical and psychiatric records. (Eunice Jenkins Deposition ("Jenkins Dep.") at 30).

At some point after his return from the hospital, Department employees placed Cills on suicide watch.[8] (Bylone Dep. at 36–37).

## C. *The Department's Suicide Policy*

At the time of Cills' incarceration, the Department did not have a written suicide policy, but there was a verbal policy in effect. (Stephan Kaftan Deposition ("Kaftan Dep.") at 71–72). According to Jenkins, the following suicide protocol was in effect at the Jail:

> Basically I remember we had discussed the protocol that if an inmate made a statement that he would harm himself or that he would be a harm to others, the nurse that was attending to that particular patient would then notify the lieutenant, the lieutenant would notify the captain during business hours at the facility, and if not, if it was after business hours he would be notified at home via
> telephone or beeper.
> Then a decision would be made. If a decision would be made to put an inmate on suicide watch, that inmate would then go on suicide watch.
> There was paperwork involved in that that had to be signed. Okay? And that is the protocol that I remember.
> [Jenkins Dep. at 18–19].

If the nurse and the shift supervisor disagreed as to whether to place the inmate on suicide watch, the shift supervisor had the final decision-making authority. (Kaftan Dep. at 83–84).

Under the verbal policy, an inmate on suicide watch was: (1) segregated from the general population; (2) checked by a guard every fifteen minutes; (3) given medical treatment and counseling; (4) dispossessed of clothing and other personal belongings; (5) required to wear a paper gown; and (6) restricted from accessing the commissary and the telephone, and from having visitors. (*Id.* at 75–76).

If a member of the staff believed that a change in the status of an inmate on suicide watch was warranted, that status was reviewed at a senior staff meeting, which was held at least three times per week. (*Id.* at 79). Because there was no psychologist or psychiatrist on staff when Cills committed suicide, the only medical input with respect to an inmate's suicide status came from the nursing supervisor.[9] (*Id.* at 77–78).

Jenkins was a registered nurse whose only psychological training consisted of the standard courses that she had completed in nursing school. (Jenkins Dep. at 12). Consequently, Jenkins did not consider herself an expert in psychology or psychiatry. (*Id.* at 12). Nor did Nazario consider herself such an expert. (Nazario Dep. at 107–08).

Jenkins described the following procedure for removing an inmate from suicide watch: "It was my understanding that when a person was taken off of suicide watch, that they would be counseled by a psychiatric counselor.[10] The nurses were

---

**8.** It is not clear from the record whether Cills was immediately placed on suicide watch upon his return from the hospital or whether it occurred later. According to a report issued by the Cumberland County Prosecutor, Cills was not placed on suicide watch until September 12, 1996, after an unidentified inmate informed Department employees that Cills had expressed a desire to kill himself. (Plaintiff's Statement of Material Facts ("Pl. Stmt. of Mat. Facts"), Exh. K).

**9.** The report of the Cumberland County Prosecutor notes that Dr. Stephen M. Cohn was

the attending physician at the Jail, but he was not a psychologist or a psychiatrist, and was not consulted before the staff made the decision to place Cills on or remove him from suicide watch. (Pl. Stmt. of Mat. Facts, Exh. K at 1). It was not until after Cills' suicide that a trained mental health professional joined the staff at the Jail.

**10.** Although Cills had been receiving counseling from an outside professional during his incarceration, that professional was not consulted prior to removing Cills from suicide watch.

never to take an inmate off suicide watch without referring that person to a psychiatric person, person in the psychiatric department." (Jenkins Dep. at 20). If a member of the senior staff believed that an inmate should be removed from suicide watch, the matter would be discussed at a staff meeting. (*Id.* at 22; Nazario Dep. at 104). The ultimate decision was a collective one that was based on the outcome of a majority vote at the staff meeting.[11] (Jenkins Dep. at 28; Nazario Dep. at 104, 112; Kaftan Dep. at 92).

### D. *The Decision to Remove Cills from Suicide Watch*

On September 20, 1996, after speaking with Cills, James Brown ("Brown"), a State Certified Mental Health Screener at the Cumberland County Guidance Center, informed Nazario that Cills seemed "perky and talkative with a positive outlook" and that he "had no suicidal ideation and did not appear to be a suicide risk." (James Brown Affidavit at ¶¶ 3–4). Nazario spoke with Cills that day and described his state of mind as follows:

> Michael was, I mean when I met with him that day, he was just real positive, he was talking about going to vocational school, he had made some contacts while being in the jail. He had wanted to follow through with them, you know, his vocational plans. And he had already, also, during our meeting, he wanted to talk to his mother so we had you know, I let him make a phone call.
>
> *      *      *      *      *      *
>
> There was [sic] no signs of any despondency of any depression of anything.
>
> *      *      *      *      *      *
>
> Well, because I mean he had been begging for days to come off it [suicide watch]. And, he just wanted you know,

and that was, it finally happened and he was just—I mean he was happy that he was finally getting out of the infirmary and being able to be around other people.

[Nazario Dep. at 168–69].

As a result of this discussion, Nazario concluded that Cills was no longer a danger to himself and that suicide watch was not necessary. (*Id.* at 146). Jenkins made similar comments about Cills' state of mind:

> You know, we talked to him, myself and Juanita Nazario. We asked him how he was doing. He said fine, he was looking forward to going home very soon. I can't recall what particular day, although he did tell us. He was just fine. He was very happy. Very jolly to be specific. And I remember feeling good about you know, his well-being.

[Jenkins Dep. at 25].

At the senior staff meeting on Friday, September 20, 1996, Jenkins and Nazario suggested that the staff should consider removing Cills from suicide watch in light of their impression that his mental state had improved. After a discussion, the senior staff unanimously agreed that Cills should be removed from suicide watch and placed in administrative segregation.[12] (Nazario Dep. at 158). The following senior staff members were present at the meeting when the decision was made: Warden Kaftan, Glenn Saunders,[13] Captain Trull, Lieutenant Butler, Jenkins, and Nazario. Although it is not clear from the record, Sergeant Escobar and Robert Wharton may have been present at the meeting. (Pl. Stmt. of Mat. Facts, Exhs. K at 1 and L at 14; Nazario Dep. at 140–41; Jenkins Dep. at 22). The staff's decision went into effect at approximately 3:30 p.m. on the same day. (Pl. Stmt. of Mat. Facts, Exh. L at 14). Beginning with the

---

11. Some staff members believed that Warden Kaftan ultimately had veto power over the majority, but Warden Kaftan claimed that he did not have veto power and that he never voted. (Kaftan Dep. at 101).

12. According to Warden Kaftan, Cills requested that he be placed in administrative segregation. (Kaftan Dep. at 124–25).

13. Glenn Saunders worked in the Inmate Affairs department. (Pl. Stmt. of Mat. Facts, Exh. K at 1).

4:00 p.m. to midnight shift, the corrections officer on duty observed Cills in his cell every half hour.[14] (Id.).

### E. Cills' Suicide

At about 11:30 p.m. on September 21, 1996, Cills' lifeless body was found hanging from a bed sheet in his cell. After Cills was discovered, Sergeant Frank Jones summoned an ambulance and Cills was rushed to Bridgeton Hospital. (Pl. Stmt. of Mat. Facts, Exh. L at 2). After revival attempts failed, he was declared dead at 12:15 a.m. This action ensued.

### SUMMARY JUDGMENT STANDARD

Under Fed.R.Civ.P. 56(c), a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The nonmoving party may not simply rest on its pleadings to oppose a summary judgment motion, but must affirmatively come forward with admissible evidence establishing a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. Pollock v. American Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3rd Cir.1986). The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that

might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248, 106 S.Ct. 2505. Where the moving party has carried its initial burden of demonstrating the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A genuine issue for trial does not exist "unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." J.E. Mamiye & Sons, Inc. v. Fidelity Bank, 813 F.2d 610, 618 (3rd Cir.1987) (Becker, J., concurring).

### DISCUSSION

### I. The Low–Level Employees Were Neither Deliberately Nor Recklessly Indifferent to Cills' Known Need for Medical Care and Personal Security

The Low–Level Employees argue that they are entitled to summary judgment because they did not act in a deliberately indifferent manner when they removed Cills from suicide watch. Plaintiff contends that the decision to remove Cills from suicide watch without obtaining any input from a mental health professional amounted to deliberate indifference to Cills' medical and security needs. The Court finds that the plaintiff has failed to show that any Low–Level Employee acted with deliberate or reckless indifference, and, thus, they are entitled to summary judgment.

### A. Section 1983 Standard

To establish a claim for a violation of a constitutional right pursuant to 42 U.S.C. § 1983,[15] a plaintiff must prove the follow-

---

14. Administrative segregation involves less intense scrutiny of inmates since they are checked every thirty minutes, rather than every fifteen minutes.

15. 42 U.S.C. § 1983 provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to

ing: (1) a violation of a right secured by the Constitution and laws of the United States; and (2) that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (citations omitted). Here, two of Cills' constitutional rights are implicated, namely, the Eighth Amendment prohibition against cruel and unusual punishment and the Fourteenth Amendment right to personal security. Because there is no dispute that the defendants were acting under color of state law, the only issue requiring analysis is whether any defendant caused Cills to suffer a constitutional deprivation.

**B.  *A Prisoner's Eighth Amendment Right to Adequate Medical Care***

■ The Eighth Amendment to the United States Constitution, made applicable to the individual states through the Fourteenth Amendment, prohibits the infliction of cruel and unusual punishment on convicted criminals. *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). The proscription against the imposition of cruel and unusual punishment requires prison officials to provide inmates with adequate medical care. *Estelle v. Gamble,* 429 U.S. 97, 103–04, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). To establish a claim for a violation of the right to adequate medical care, a plaintiff must allege the following: (1) a serious medical need; and (2) action by prison officials that constitutes deliberate indifference to that need. *Id.* at 106, 97 S.Ct. 285.

**C.  *A Prisoner's Fourteenth Amendment Right to Personal Security***

■ The Supreme Court has determined that convicted criminals possess a right to personal security guaranteed by the Fourteenth Amendment. *See Youngberg v. Romeo,* 457 U.S. 307, 315, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). Although "a prison custodian is not the guarantor of a

the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an

prisoner's safety," *Freedman v. City of Allentown,* 853 F.2d 1111, 1115 (3rd Cir. 1988), it has been recognized that there is a limited duty for prison officials to protect prisoners from self-inflicted harm. But the mere fact that an inmate has harmed himself does not give rise to an inference "that the prison officials have recklessly disregarded their obligation to take reasonable precautions to protect the safety of prisoners entrusted to their care." *Id. See Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (stating that prison administrators "are under an obligation to take reasonable measures to guarantee the safety of the inmates themselves").

**D.  *Liability of Prison Officials for Prisoner Suicide***

In light of prisoners' Eighth and Fourteenth Amendment rights, courts have struggled to define the boundaries of liability for prison officials under section 1983 based on a failure to discharge their duty to protect prisoners from self-inflicted harm. The difficulty arises because, in the context of a prison suicide, there is never a direct infliction of harm by a state actor; instead, there is a self-inflicted harm that results in the inmate's death. *Colburn v. Upper Darby Township,* 946 F.2d 1017, 1023 (3rd Cir.1991) (*"Colburn II"*). Although states are not required to furnish prisoners with suicide-proof prisons, *Swan by Carello v. Daniels,* 923 F.Supp. 626, 636 (D.Del.1995), the Third Circuit has recognized that, under some circumstances, a prisoner's suicide can give rise to liability under section 1983. *See Freedman, supra,* 853 F.2d at 1115; *Colburn v. Upper Darby Township,* 838 F.2d 663, 667–70 (3rd Cir. 1988) (*"Colburn I"*), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989); *Snyder v. Baumecker,* 708 F.Supp. 1451, 1460 (D.N.J.1989).

■ The Third Circuit has adopted the following three-part test that a plaintiff

action at law, suit in equity, or other proper proceeding for redress."

must satisfy to prove a constitutional deprivation in a prison suicide case: "(1) the detainee had a 'particular vulnerability to suicide,' (2) the custodial officer or officers knew or should have known of that vulnerability, and (3) those officers 'acted with reckless indifference' to the detainee's particular vulnerability." *Colburn II, supra,* 946 F.2d at 1023.[16]

In the present case, there can be no dispute that plaintiff has satisfied the first two elements. Cills clearly had a particular vulnerability to suicide because of his long-standing mental illness and prior suicide attempts. Second, it is undisputed that Jenkins and Nazario had actual knowledge of Cills' suicidal vulnerability. It can reasonably be inferred that any other Department employee who was aware that Cills was on suicide watch would also have been aware of his vulnerability to commit suicide. Obviously, an inmate is placed on suicide watch when there is reason to believe that he poses a suicide risk. Thus, all Department employees who were present at the senior staff meeting at which the decision was made to remove Cills from suicide watch were aware of Cills' vulnerability to commit suicide. The more difficult question presently facing the Court is whether there is an issue of material fact as to whether any LowLevel Employee acted in a deliberately or recklessly indifferent manner by removing Cills from suicide watch on September 20, 1996.

### E. *Deliberate Indifference and Reckless Indifference*

In *Farmer v. Brennan,* 511 U.S. 825, 836, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), the Supreme Court explained that the term deliberate indifference falls somewhere along the legal culpability spectrum between the concept of ordinary negligence and purposeful or knowing conduct. Adopting a subjective test for deliberate indifference, the *Farmer* Court held that the concept requires that the "official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837, 114 S.Ct. 1970. *See Urrutia v. Harrisburg County Police Dept.,* 91 F.3d 451, 456 (3rd Cir.1996) (citation omitted) ("Deliberate indifference means that an official acted or failed to act despite his knowledge of a substantial risk of serious harm.").

However, neither the Supreme Court nor the Third Circuit has defined the term reckless indifference. In *Williams v. Borough of West Chester,* 891 F.2d 458, 464 n. 10 (3rd Cir.1989) (citation omitted), the Third Circuit stated that "we have not attempted to draw distinctions among terms like 'reckless indifference,' 'deliberate indifference,' 'gross negligence,' or 'reckless disregard' in this context. We decline to do so in this opinion and will, therefore, use the term 'deliberate indifference' to refer to the type of conduct or state of mind described by these terms collectively." In *Colburn II,* the Third Circuit again declined to define reckless indifference in the context of a prison suicide case, choosing instead to state that:

A higher level of culpability, one involving "reckless or deliberate indifference," is required.... In Colburn I, we referred to "reckless indifference" as the standard for judging the defendant's conduct. In Williams, we referred to "deliberate indifference." Both panels expressly declined to distinguish or precisely define these two concepts. We find it unnecessary to do so in this case. It will suffice for present purposes to note that a level of culpability higher

---

**16.** Although the Third Circuit used the term detainee, which refers to a pre-trial detainee who is protected by the Fourteenth Amendment, the prison suicide standard is also applicable to convicted criminals, like Cills, who are protected by the Eighth Amendment. *See*

*Swan by Carello, supra,* 923 F.Supp. at 631 (citations omitted) (noting that "Third Circuit has determined that the level of protection afforded to prisoners by the Eighth and Fourteenth Amendments is the same").

than a negligent failure to protect from self-inflicted harm is required and that this requirement is relevant to an evaluation of the first two Colburn I elements as well as the third.

[*Colburn II, supra,* 946 F.2d at 1024].

The Court does not find it necessary to define reckless indifference in the context of a section 1983 action, although other courts have done so. *See, e.g., Medina v. City and County of Denver,* 960 F.2d 1493, 1496 (10th Cir.1992) (citation omitted) (stating that "reckless intent is established if the actor was aware of a known risk or obvious risk that was so great that it was highly probably that serious harm would follow and he or she proceeded in conscious and unreasonable disregard of the consequences"); *Redman v. County of San Diego,* 942 F.2d 1435, 1449 (9th Cir.1991) (en banc) (defining reckless indifference as conduct which is "so reckless as to be tantamount to a desire to inflict harm"), *cert. denied,* 502 U.S. 1074, 112 S.Ct. 972, 117 L.Ed.2d 137 (1992). It will suffice to note that the concepts of deliberate indifference and reckless indifference are practically indistinguishable, and, in the present case, any difference is inconsequential to the Court's decision because the alleged conduct of the Low–Level Employees amounted to no more than ordinary negligence which is less culpable conduct than either deliberate or reckless indifference.

### F. *No Low–Level Employee Acted in a Deliberately or Recklessly Indifferent Manner*

■ Plaintiff points to a number of facts in support of the claim that the Low–Level Employees were deliberately indifferent or recklessly indifferent to Cills' vulnerability to suicide. First, Nazario and Jenkins had actual knowledge of Cills' past psychiatric problems which predated his incarceration. Second, several defendants believed that Nazario was a psychologist or a psychiatrist. Third, after his removal from suicide watch, Cills had a severe anxiety attack.[17] Fourth, after being removed from suicide watch, Cills was placed in an administrative segregation cell that had no light, a defective door and an inoperable intercom unit.[18] Fifth, Department employees inexplicably cancelled Cills' appointment with an outside psychologist several days before his death. Sixth, Cills' medical records were available for review by any defendant.

In addition, plaintiff's expert contends that the Low–Level Employees' decision to remove Cills from suicide watch was not based on reliable clinical information derived from a mental status evaluation, and, thus, the decision amounts to a willful disregard of the risk that Cills would commit suicide. (James E. Lawrence Deposition[19] ("Lawrence Dep.") at 20–21). Plaintiff's expert further asserts that the Low–Level Employees should have consulted a medical expert to consider various suicide factors before making the decision to remove Cills from suicide watch. (Pl. Stmt. of Mat. Facts, Exh. B at 11).

According to plaintiff, the above facts and James Lawrence's opinion, when considered together, create a genuine issue of material fact which precludes a grant of summary judgment in favor of the Low–

---

17. This assertion is based on the recorded statement of Ann D. Blake, a Department employee. She stated that after Cills was removed from suicide watch he was permitted to use the recreation yard and he "was not getting along with the other inmates," "acted very anxious and very upset," and began to "hyperventilate." (Pl. Stmt. of Mat. Facts, Exh. D at 12–13).

18. The Court does not consider the fact that Cills was placed in administrative segregation with inadequate lighting, a broken door and

an inoperable intercom unit evidence of a deprivation of the right to adequate medical care. *See Griffin v. Vaughn,* 112 F.3d 703, 709 (3rd Cir.1997) (finding prolonged administrative segregation not unconstitutional).

19. James Lawrence, plaintiff's expert, is not trained in the field of psychology or psychiatry, but rather is "an expert in the quality and availability of health and mental healthcare delivery in a correctional setting." (Lawrence Dep. at 9).

Level Employees. The Court disagrees. Even if the Court assumes that all of plaintiff's factual assertions are true, there is no evidence that any of the Department employees engaged in conduct that rises to the level of deliberate or reckless indifference to Cills' suicidal vulnerability. Lawrence's opinion that the failure to consult a trained mental health professional is evidence of deliberate indifference on the part of the Low–Level Employees is misplaced. Rather, that failure is evidence that the Department's underlying suicide policy was flawed for not having a professional on staff to consult.

Nazario and Jenkins had received information from Brown that Cills no longer appeared to be a danger to himself, and they confirmed Brown's assessment after speaking with Cills and observing his improved mood. They found Cills to be optimistic about his future release date which caused them to subjectively believe that there was no longer a danger that Cills would commit suicide. At the subsequent senior staff meeting, Jenkins and Nazario recommended that Cills be removed from suicide watch based on their impression that he did not harbor suicidal thoughts. This recommendation was made in good faith with the belief that it was in Cills' best interest.

The other senior staff members apparently relied to some extent on their recommendation when deciding whether to vote to remove Cills from suicide watch. These staff members also acted in good faith based on the recommendation that was presented at the meeting. There is simply no support for plaintiff's argument that the Low–Level Employees voted to remove Cills from suicide watch despite having knowledge that there was still a substantial danger that Cills would kill himself. All of the information in their possession supported the reasonable conclusion that Cills was no longer suicidal. The Court finds that because their actions were not made with the knowledge that resulting harm was substantially likely to result, their decision did not exhibit deliberate or reckless indifference to Cills' constitutional rights.[20]

In hindsight, the Low–Level Employees' decision turned out to have tragic consequences, and there may have been additional measures that could have been taken that would have prevented Cills' suicide. It is undisputed that none of the members of the senior staff had extensive psychological or psychiatric training to gauge plaintiff's state of mind. There is also no dispute that those defendants did not obtain a recommendation or consult with a psychologist or psychiatrist before voting to remove Cills from suicide watch.[21] However, they complied with the Department's verbal suicide policy and used their best judgment in reaching the decision to remove Cills from suicide watch. The Low–Level Employees' failure to seek additional information or advice amounted to no more than negligence, if that. *See Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3rd Cir.1979) (stating that "negligence in the administration of medical treatment to prisoners is not itself actionable under the Constitution . . . ").

Viewing the facts in a light most favorable to the non-movant, the Court finds that plaintiff has failed to set forth sufficient evidence to create a genuine issue of material fact that the Low–Level Employees acted in a deliberately or recklessly indifferent manner when making the deci-

---

**20.** It is unknown whether a qualified professional would have reached a similar conclusion. However, such information is not a material issue because an incorrect diagnosis by itself without proof of deliberate or reckless indifference is not unconstitutional. *See White v. Napoleon*, 897 F.2d 103, 108 (3rd Cir.1990) (stating that "[m]ere medical malpractice" is not unconstitutional).

**21.** Lawrence's opinion that the senior staff's failure to consult a mental health professional supports plaintiff's argument that the Department had an unconstitutional suicide policy. The senior staff's failure to consult such an expert cannot be considered deliberate or reckless indifference.

sion to remove plaintiff from suicide watch or at any other time during Cills' incarceration. Therefore, summary judgment in favor of the Low–Level Employees is warranted.

## II. *The Department's Suicide Protocol is an Official Policy that Can Serve as the Basis for Imposing Independent Municipal Liability*

The Department and Warden Kaftan argue that they are entitled to summary judgment because there is no unconstitutional custom or policy upon which plaintiff can sustain municipal liability. Plaintiff contends that the Department's verbal suicide protocol provides a sufficient basis to impose liability on the Department and Warden Kaftan. The Court agrees with plaintiff, and, accordingly, summary judgment in favor of the Department and Warden Kaftan is denied.

## A. *Municipal Liability Under 42 U.S.C. § 1983*

■ "Municipal liability only arises when a constitutional deprivation results from an official custom or policy." *Montgomery v. De Simone,* 159 F.3d 120, 126 (3rd Cir.1998) (citation omitted). In *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the Supreme Court held "that municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Municipal liability under section 1983 cannot be based on the theory of respondeat superior. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (citation omitted). In order to impose liability, a plaintiff must establish "a direct causal link between a municipal policy or custom, and the alleged deprivation." *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

■ In *Simmons v. City of Philadelphia,* 947 F.2d 1042 (3rd Cir.1991), *cert. denied,* 503 U.S. 985, 112 S.Ct. 1671, 118 L.Ed.2d 391 (1992), the Third Circuit clarified the somewhat murky concept of municipal liability under section 1983 in the context of a jail suicide. There, a detainee committed suicide in a Philadelphia station house after being taken into police custody for public intoxication. *Id.* at 1048–49. The detainee's mother brought suit under section 1983 and Pennsylvania law against the City of Philadelphia ("City") and Officer Panati, the station house turnkey who was responsible for supervising the detainee. *Id.* at 1050. At trial, plaintiff sought to establish that the City was liable based on an unconstitutional "policy or custom of inattention amounting to deliberate indifference to the serious medical needs of intoxicated and potentially suicidal detainees." *Id.* The jury returned a verdict finding that Officer Panati had not violated the decedent's constitutional rights, but that the City had "a custom, policy, or regulation which deprived the decedent of his constitutional rights." *Id.* at 1054. On appeal, the City contended, inter alia, that the jury verdict was inconsistent because the turnkey had not violated the decedent's constitutional rights, and, thus, there could be no independent municipal liability in the absence of a verdict against any municipal employee. *Id.* at 1055–56.

A divided panel rejected the City's claim that the verdict was inconsistent. Judge (now Chief Judge) Becker concluded that the liability of the turnkey was not a prerequisite to holding the City liable for an unconstitutional policy. *Id.* at 1062–63. Instead, the City's independent liability was established by finding that the City's policymakers were the state actors who were liable, not Officer Panati. "Because Panati, a low-level employee, is not the City actor whose primary section 1983 liability must have been established as a predicate to subjecting the City to section 1983 liability for a policy or custom or a failure to train, I find no inconsistency in the jury's section 1983 verdicts in this

case." *Id.* at 1063 (footnote omitted). Judge Becker further explained that "I have concluded that a municipality's section 1983 liability is conditioned on the liability of a municipal actor who is a high-level policymaker, as opposed to a low-level employee...." *Id.* at 1063 n. 17.

Concurring in the judgment, Chief Judge (now Judge) Sloviter agreed with Judge Becker that "the jury verdict can be upheld on the basis of the City's liability independent of Panati's culpability." *Id.* at 1089 n. 1. In *Fagan v. City of Vineland*, 22 F.3d 1283, 1294 (3rd Cir.1994), the Third Circuit reaffirmed the proposition that there can be independent municipal liability under section 1983, holding "that a municipality can be liable under section 1983 and the Fourteenth Amendment for a failure to train its police officers with respect to high-speed automobile chases, even if no individual officer participating in the chase violated the Constitution."

Therefore, in the present case, the fact that the Court finds that none of the Low–Level Employees violated Cills' constitutional rights does not preclude the Court from finding that the Department may be independently liable for an unconstitutional policy.

**B. *The Constitutional Duty to Provide Inmates with Mental Health Treatment***

Plaintiff alleges that the Department's suicide policy, which had been created and implemented by Warden Kaftan, resulted in constitutionally "inadequate medical care and treatment ... to the plaintiff." (Complaint at ¶ 26). The Eighth Amendment imposes on prison officials a constitutional duty to "provide medical care for those whom it is punishing by incarceration." *Estelle, supra,* 429 U.S. at 103, 97 S.Ct. 285. Not only does this constitutional obligation apply to medical care for physical injury or illness, but also it en-

compasses mental illness. *See Inmates of Allegheny County Jail, supra,* 612 F.2d at 762.

In *Inmates of Allegheny County Jail,* inmates filed a civil rights class action challenging numerous conditions at a county jail, including the basically nonexistent psychiatric care provided at the facility. There was not a single psychiatric care staff member at the Allegheny County Jail and only one part-time physician and five registered nurses. *Id.* at 761. Despite acknowledging that the deliberate indifference standard set forth in *Estelle* "affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients," the Third Circuit held that "when inmates with serious mental ills are effectively prevented from being diagnosed and treated by qualified professionals, the system of care does not meet the constitutional requirements set forth by *Estelle v. Gamble, supra,* and thus violates the Due Process Clause." *Id.* at 762.

**C. *A Reasonable Factfinder Could Conclude that the Department's Suicide Policy Was Constitutionally Deficient***

■ Here, Warden Kaftan was the high-level Department official responsible for implementing the Department's official policies and procedures, and shortly after assuming the position of warden in April 1995, he began to overhaul the policies, including the suicide policy.[22] (Kaftan Dep. at 62–63,72). Under the Department's verbal suicide policy that was in effect at the time of Cills' incarceration, the decision to remove an inmate from suicide watch was made by senior staff members who had no specific psychiatric training. There was neither a psychologist nor a psychiatrist on staff to assess the mental health of inmates and to pro-

---

**22.** The Court regards the Department's verbal suicide policy as an official policy upon which municipal liability can potentially be imposed. *See Pembaur, supra,* 475 U.S. at 480–81, 106 S.Ct. 1292 (stating that " 'official policy' often refers to formal rules or understandings— often but not always committed to writing— that are intended to, and do, establish fixed plans of action to be followed under similar circumstances").

vide any guidance as to whether an inmate posed a suicide risk. (Kaftan Dep. at 77–79). In fact, despite Warden Kaftan's own admission that he did not have "the expertise to say someone is suicidal," (Kaftan Dep. at 108), he did not have any qualified professionals on staff to provide guidance when such crucial decisions had to be made. Rather, he left such decisions to the judgment of the senior staff members, none of whom were qualified to make such an assessment.

A reasonable factfinder could conclude that the absence of qualified mental health personnel who could assist the Department employees in making an assessment of an inmate's suicidal vulnerability was a serious deficiency in the Department's suicide policy that created a serious risk that injury or death would result from an inmate's attempted or successful suicide. *See Inmates of Allegheny County Jail, supra,* 612 F.2d 754. Consequently, a reasonable factfinder could find that this policy breached the Department's constitutional duty under the Eighth Amendment to provide adequate medical care to inmates, thereby causing Cills to suffer a constitutional deprivation. Further, with respect to Warden Kaftan's culpability, the Court finds a genuine issue of material fact as to whether he knew of and disregarded the serious risk to inmate safety which existed from the absence of a mental health professional on staff. Therefore, summary judgment in favor of the Department and Warden Kaftan is denied.

## CONCLUSION

For the foregoing reasons, the Court grants the motion for summary judgment filed by the Low–Level Employees, and denies the motion for summary judgment filed by the Department and Warden Kaftan. An appropriate order is attached.