# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 11-1178

———————

Sherry Luckert, Personal    *
Representative of the Estate    *
of Troy Sampson, Deceased,    *
   *
       Appellee,    *
   *    Appeal from the United States
     v.    *    District Court for the
   *    District of Nebraska.
Dodge County, a Nebraska    *
Political Subdivision; Doug    *
Campbell, in his individual    *
and official capacity; Cynthia    *
Julian, R.N., in her individual    *
and official capacity,    *
   *
       Appellants.    *

———————

Submitted: November 16, 2011
Filed:  June 22, 2012

———————

Before RILEY, Chief Judge, BEAM and BYE, Circuit Judges.

———————

RILEY, Chief Judge.

Troy Sampson committed suicide while detained at the Dodge County Jail (DCJ) in Fremont, Nebraska.  Sampson's mother, Sherry Luckert, acting as the personal representative of Sampson's estate, sued Dodge County and jail officials

under 42 U.S.C. § 1983, claiming they were deliberately indifferent to Sampson's medical needs, violating his due process rights.  A jury found Dodge County and DCJ's director and nurse (collectively, appellants) liable and awarded Luckert actual and punitive damages.  The district court denied the appellants' motion for judgment as a matter of law, entered judgment in favor of Luckert, and awarded her attorney fees and costs.  We reverse the denial of judgment as a matter of law and vacate the awards of damages and attorney fees and costs for Luckert.

I.    BACKGROUND
    A.    Facts[1]
        1.    Dodge County Jail
On August 10, 2006, Troy Sampson committed suicide in his DCJ cell.  DCJ, which is now closed, held up to 42 inmates, all of whom either had not yet been convicted of a crime or who were serving a sentence of less than one year.  Sampson was the third DCJ inmate to commit suicide and the twenty-first attempting to commit suicide since 2000.

Appellant Doug Campbell, appointed in 1995, was the director of DCJ at the time of Sampson's suicide.  Among other responsibilities, Campbell was in charge of training and scheduling staff and making sure the staff followed DCJ's policies.

To provide for the inmates' medical needs, DCJ contracted with local physicians, including Dr. Mohammad Shoaib, a Fremont area psychiatrist.  DCJ also employed a nurse, who, according to Campbell, served as the gatekeeper between the inmates and the doctors.  The nurse coordinated the inmates' medical care, ensured inmates received prescribed medications, and directed the jail staff concerning medical

---

[1]"We recite the facts in the light most favorable to the jury's verdict[]."  Der v. Connolly, 666 F.3d 1120, 1123 (8th Cir. 2012) (quoting White v. McKinley, 605 F.3d 525, 528 (8th Cir. 2010)) (internal quotation marks omitted).

and suicide watches. In July 2006, approximately one month before Sampson was detained there, DCJ hired appellant Cynthia Julian, a registered nurse since 1996, to be DCJ's full-time permanent nurse.

At the time of Sampson's suicide, Dodge County's Corrections Policy & Procedure Manual included a written Suicide Intervention Policy (Policy 12.4). Implemented in December 1994, Policy 12.4 had not been revised before Sampson's suicide. At trial, Campbell and Julian acknowledged DCJ did not follow aspects of Policy 12.4, including its identification of three suicide levels: (1) Alert, which required close observation of the inmate and placement in the safety cell; (2) Warning, which required visual checks of the inmate in intervals no longer than ten minutes (ten-minute watch); and (3) Watch, which required visual checks of the inmate in intervals no longer than twenty minutes (twenty-minute watch).

Campbell testified DCJ instructed employees about Policy 12.4 during orientation, but certain provisions of the policy, such as keeping a suicide notebook and recording daily assessments, were not followed. Julian had not yet gone through new employee orientation, or any formal suicide training, at the time of Sampson's suicide. Julian testified she could not remember whether she knew of Policy 12.4 at that time. Julian also testified DCJ's practice was to put inmates displaying suicidal tendencies on either a fifteen-, twenty-, or thirty-minute watch.

### 2. Sampson's Detention at DCJ

When DCJ admitted Sampson on Sunday, July 30, 2006, Sampson answered no when asked if he had ever attempted suicide or was thinking about committing suicide. Luckert called DCJ and reported Sampson had attempted suicide two weeks earlier by trying to hang himself. DCJ also learned Sampson was on anti-psychotic medication. In light of this information, and because Sampson seemed mentally unstable, DCJ kept Sampson in the booking area overnight and put him on a twenty-minute suicide watch.

Julian met with Sampson the next day. Julian noted Sampson complained of post-traumatic distress disorder, depression, anxiety attacks, and psychosis. Julian observed Sampson was "very anxious," "tearful," and had "flight of ideas," meaning he changed topics often. Julian testified Sampson denied he was suicidal, and Julian did not believe Sampson was a danger to himself or others.

That same day, Julian contacted Sampson's psychiatrist, Dr. Stephen O'Neill, who worked at the Norfolk Regional Center. Julian's notes indicate Dr. O'Neill saw Sampson about a week prior and had prescribed Klonopin and Cymbalta for Sampson. Dr. O'Neill advised DCJ to put Sampson on suicide watch until he was "medically/ psychologically stable [and] back on [medication]." Julian kept Sampson on suicide watch, but downgraded it from a twenty-minute watch to a thirty-minute watch. Sampson officially remained on a thirty-minute suicide watch until he committed suicide. DCJ records indicate jail staff missed multiple watches during Sampson's detention.[2] Throughout Julian's work day, she periodically observed Sampson.

On July 31, Julian faxed information concerning Sampson to DCJ's contract psychiatrist, Dr. Shoaib. Julian advised Dr. Shoaib of Sampson's current medications and "long psychiatric history from the Norfolk Regional Center."[3] Julian received and

_____

[2]DCJ's log sheets reflect one missed watch per day between August 2-4 and five missed watches on both August 5 and 6. The log sheets show no missed watches for the three days before or the day of Sampson's suicide.

[3]Dr. O'Neill wrote a synopsis of Sampson's psychiatric history on August 1. Julian testified she received this report on August 5. Dr. O'Neill also included outpatient progress notes from July 19, 20, and 24, 2006. Dr. O'Neill listed the following as Sampson's diagnostic impression:

Adjustment Disorder with Depressed Mood and Anxiety with Subsequent Worsening of Headaches; Posttraumatic Stress Disorder (from being abused in Mexican prison); Personality Change Secondary to Head Injury with Worsening of Pre-existing Antisocial and Paranoid

-4-

reviewed Sampson's medical records from the Norfolk Regional Center and advised Dr. Shoaib she had requested that the Norfolk Regional Center forward Sampson's medical history to him. Julian requested Dr. Shoaib review the material and advise her what medications Sampson should take and "what you feel would be best for this patient."

On Tuesday, August 1, Dr. O'Neill prescribed medications for Sampson. That same day, at Julian's direction, DCJ moved Sampson out of the holding area and into its general population. Julian testified she did so in part because she "didn't want him laying on the concrete floor," and because she "wanted him in general population to be around other people." DCJ moved Sampson to a different cell on August 3 and again on August 5. At least one of these moves appears to be at Sampson's request.

Dr. Shoaib saw Sampson on Thursday, August 3. Dr. Shoaib testified Sampson "was very, very anxious, very agitated, psychotic" and "bizarre and unpredictable." Dr. Shoaib said that Sampson denied being suicidal, but Dr. Shoaib recommended DCJ "keep [Sampson] on suicide watch until his behaviors settle[d] down and he became less agitated." Indicating Sampson was not suicidal or homicidal, Dr. Shoaib changed Sampson's prescriptions.

Julian next saw Sampson on Monday, August 7, in response to two Requests for Medical Care Sampson made on August 3 and August 6.[4] Julian testified she did not

---

Personality Disorder (can appear psychotic under stress); Cannabis Dependence (he likely does use to self-medicate for headaches); Personality Disorder, Not Otherwise Specified, with Antisocial and Paranoid Features; Probable Post Concussive Headaches, Secondary to Concussion and Head Injury (from being hit with pistol in 1998).

[4]In his August 3 Request for Medical Care, Sampson wrote, "What are these drugs you are giving me? Id [sic] like a drug fact sheet + side effect. Wish to see Nurse[.] No Cymbalta! Could you please get an American psychiatrist that speaks

see Sampson's written requests until August 7, when she returned to the office from a weekend off. Julian testified Sampson appeared "kind of glassy-eyed, foggy, [and] overmedicated." Julian advised Sampson he was taking the medications Dr. Shoaib prescribed and that it would take one or two weeks before the side effects disappeared. That same day, Julian contacted Dr. Shoaib and reported her observations of Sampson. Dr. Shoaib ordered a reduction in the dosage of Sampson's medication.

At trial, Luckert's counsel confronted Julian with Sampson's Medication Administration Record, which Julian had filled out, as well as the prescription orders from Dr. Shoaib. Though not entirely clear from these documents, it appears Julian failed to ensure Sampson was medicated in compliance with Dr. Shoaib's orders. As a result, it was reasonable for the jury to infer (1) DCJ gave Sampson higher than prescribed doses of Risperidone (an antipsychotic drug) and Klonopin (an anti-anxiety drug) from August 7 to August 10, and (2) failed to give Sampson Lunesta (a sleeping aid) as prescribed for the entirety of his detention. Other documents demonstrate DCJ failed to give Sampson one dose of Klonopin on August 1.

Later on August 7, Sampson submitted another Request for Medical Care and two Inmate Request forms. In all three requests, Sampson again asked DCJ to move him to the safety cell or solitary confinement and stressed he wanted to be alone and did not want a window or a television in his cell. The safety cell was a special cell that was designed to be suicide resistant. Julian replied to Sampson's requests the next day, telling him DCJ did not have such a cell available. Another staff member responded by writing, "The Safety Cell cannot be used at this time. When something

clear English or let me see my own psychiatrist." On Sunday, August 6, before Julian responded, Sampson submitted another Request for Medical Care, writing, "Need to be transferred to Norfolk Regional Center to Dr. Stephen O'Niell [sic] or I will die in here. My head is killing me. These meds are making me sick [and] confused." That same day DCJ officials reported Sampson said he was no longer going to eat and did not eat one meal.

opens up we will try and move you." Campbell and Julian both testified the safety cell was not available because another inmate had broken its glass window on August 3 and it had not yet been repaired.

On Tuesday, August 8, a DCJ official transported Sampson to his bond hearing, during which Sampson told the judge, "I've been trying to get into the Norfolk Regional Center before this happened, and they were full, and then I went every recourse to try and get help, and it seems like every door was shut in my face." Later that day, Luckert visited Sampson at DCJ. Luckert testified Sampson was tearful and erratic. Luckert claimed before she left DCJ, she told a DCJ employee Sampson was "definitely suicidal" and DCJ employees needed to watch him. That same day, Sampson filled out another Request for Medical Care asking to see Dr. Shoaib on Thursday. Julian responded to Sampson's request the next day, telling Sampson he had an appointment scheduled for Thursday, August 10.

On Thursday morning, August 10, Dr. Shoaib met with Sampson again and evaluated Sampson's condition. Dr. Shoaib observed Sampson had "calmed down" since his last visit. Dr. Shoaib testified he asked Sampson if he was suicidal. According to Dr. Shoaib, Sampson responded, "No Doc, it's not that. I want to go to Norfolk Regional Center. I do not belong [at DCJ]. I am not a criminal. I have a mental problem and I have to be in Norfolk Regional Center." Dr. Shoaib testified he discussed various options with Sampson, including telling him that "if you are suicidal I can send you to the hospital, you can be [in Emergency Protective Custody] and then from there the hospital mental health board can commit you to the Norfolk Regional Center." According to Dr. Shoaib, Sampson again denied suicidal thoughts. Dr. Shoaib testified he did not believe Sampson was suicidal at that time—August 10. Dr. Shoaib adjusted Sampson's prescription and asked that Sampson schedule another appointment in two weeks.

Later that afternoon, Sampson attended a bible study. According to the testimony of the volunteer study leader, another inmate asked whether a person who committed suicide could still go to heaven. The leader testified that during the resulting discussion, Sampson said everyone had thought about suicide at least once during their life. The leader was not concerned about Sampson's statement and did not report the conversation to DCJ officials.

At approximately 4:35 p.m. on August 10, staff discovered "Sampson hanging by a bed sheet from the vent above the toilet." Attempts to revive Sampson were unsuccessful and he was pronounced dead.

As required by Nebraska law, see Neb. Rev. Stat. § 29-1401(4), a grand jury investigated Sampson's death. The grand jury urged the Dodge County Board of Supervisors to "review their policies and procedures, particularly in dealing with medical watch inmates." The grand jury called "for change in the style or type of venting cover in individual cells" and made general recommendations, including (1) the use of "cameras and other surveillance during these intensified suicide watch periods"; (2) "more staffing" as a general deterrence; (3) increased training for staff, "particularly in response to medical watch inmates"; and (4) modification of the suicide watch forms. The grand jury also expressed concerns about "the entire management of [DCJ], top to bottom" and the "workload of the jail nurse."

## B. Prior Proceedings

On April 23, 2007, Luckert filed a 42 U.S.C. § 1983 civil rights claim against the appellants. As relevant to this appeal, Luckert alleged Sampson's due process rights arising from the Eighth and Fourteenth Amendments were violated by (1) the appellants' deliberate indifference to Sampson's serious medical needs; (2) Dodge County's custom or policy of failing to implement reasonable suicide prevention practices; and (3) Dodge County's failure to train its employees to observe and act upon signs of a risk of suicide among its detainees (failure to train claim).

-8-

The appellants moved for summary judgment, arguing they were entitled to qualified immunity because Luckert could not show they were deliberately indifferent to the risk Sampson would commit suicide. The district court denied the appellants' motion, finding the appellants were not entitled to qualified immunity because there were factual questions for the jury to determine.

The district court presided over a six-day trial in June 2010. At the close of Luckert's case, the appellants moved for judgment as a matter of law. See Fed. R. Civ. P. 50(a). The district court denied the motion.

On June 28, 2010, the jury returned a verdict in favor of Luckert and against all of the appellants. The jury found both Julian and Campbell were deliberately indifferent to Sampson's serious medical needs. The jury found Dodge County was liable "for a policy or custom of failing to implement reasonable suicide prevention practices," but found in favor of Dodge County on Luckert's failure to train claim. The jury awarded Luckert $750,000 in compensatory damages and $100,000 in punitive damages—$75,000 against Campbell and $25,000 against Julian.

On July 26, 2010, the appellants renewed their motion for judgment as a matter of law pursuant to Rule 50(b), arguing "[t]he evidence adduced at trial is insufficient to sustain the verdict by the jury that . . . Dodge County, through its policy, violated Sampson's constitutional rights" and "Campbell and Julian are entitled to qualified immunity" as a matter of law. In the alternative, the appellants moved for a new trial or to alter or amend the judgment. See Fed. R. Civ. P. 59(a) and (e).

On November 10, 2010, the district court denied the appellants' motion, finding the evidence fully supported the "jury's finding of deliberate indifference to serious medical needs," as well as the compensatory and punitive damage awards. The district court entered judgment consistent with the jury verdict. On November 18, the district

court awarded Luckert attorney fees and costs. See 42 U.S.C. § 1988(b). On December 7, 2010, the appellants filed timely notice of appeal.

## II.    DISCUSSION

On appeal, the appellants contend the district court committed reversible error by (1) denying their motion for judgment as a matter of law; (2) not issuing a remittitur or striking punitive damages; (3) omitting proposed jury instructions; (4) permitting certain expert testimony; (5) allowing improper conduct by Luckert's attorney; and (6) awarding Luckert attorney fees and costs.

### A.    Judgment as a Matter of Law

The appellants challenge the district court's denial of their motion for judgment as a matter of law, claiming Julian and Campbell are entitled to qualified immunity and there was insufficient evidence to show Dodge County's practices or policies violated Sampson's due process rights.

We review the district court's denial of a motion for judgment as a matter of law de novo, "using the same standards as the district court." Howard v. Mo. Bone & Joint Ctr., Inc., 615 F.3d 991, 995 (8th Cir. 2010). A motion for judgment as a matter of law is proper only if "a reasonable jury would not have a legally sufficient evidentiary basis to find for [Luckert]." Fed. R. Civ. P. 50(a). Our review is highly deferential to the jury verdict and we do not weigh the evidence or question witnesses' credibility in reaching our conclusion. See Howard, 615 F.3d at 995.

"[T]he Eighth Amendment prohibition on cruel and unusual punishment extends to protect prisoners from deliberate indifference to serious medical needs." Vaughn v. Greene Cnty., Ark., 438 F.3d 845, 850 (8th Cir. 2006). "[A] risk of suicide by an inmate is a serious medical need." Gregoire v. Class, 236 F.3d 413, 417 (8th Cir. 2000). "Because [Sampson] was a pretrial detainee, [his] claims are analyzed under the Fourteenth Amendment's Due Process Clause rather than the Eighth

-10-

Amendment." Vaughn, 438 F.3d at 850. "Under the Fourteenth Amendment, pretrial detainees are entitled to at least as great protection as that afforded convicted prisoners under the Eighth Amendment." Id. (quoting Owens v. Scott Cnty. Jail, 328 F.3d 1026, 1027 (8th Cir. 2003) (per curiam) (internal quotation marks omitted)). In short, Sampson "had a clearly established constitutional right to be protected from the known risks of suicide and to have his serious medical needs attended to." Yellow Horse v. Pennington Cnty., 225 F.3d 923, 927 (8th Cir. 2000).

### 1.       Qualified Immunity

Our first task is to decide whether Julian and Campbell are entitled to qualified immunity. Qualified immunity is a legal question for the court, not the jury, to decide in the first instance, based either on the allegations or, if material facts are in dispute, on the facts found by the jury. See Littrell v. Franklin, 388 F.3d 578, 584-85 (8th Cir. 2004) (explaining "[t]he law of our circuit is clear . . . . [that] qualified immunity is a question of law for the court, rather than the jury, to decide"). Whether the official's conduct constitutes deliberate indifference is a question of fact for the jury. See Davis v. Hall, 375 F.3d 703, 719 (8th Cir. 2004).

Qualified immunity shields government officials performing discretionary functions from civil liability unless their conduct "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known." Ambrose v. Young, 474 F.3d 1070, 1077 (8th Cir. 2007) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (internal quotation marks omitted)). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Id. (quoting Davis, 375 F.3d at 712 (internal quotation marks omitted)). Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

-11-

In the jail suicide context, qualified immunity is appropriate when a plaintiff "has failed to show . . . that his jailers have acted in deliberate indifference to the risk of his suicide." Rellergert v. Cape Girardeau Cnty., Mo., 924 F.2d 794, 796 (8th Cir. 1991). "[P]rison supervisors such as [Campbell] cannot be held liable under § 1983 on a theory of respondeat superior." Langford v. Norris, 614 F.3d 445, 460 (8th Cir. 2010). "Supervisors can, however, 'incur liability . . . for their personal involvement in a constitutional violation, or when their corrective inaction amounts to deliberate indifference to or tacit authorization of the violative practices.'" Id. (quoting Choate v. Lockhart, 7 F.3d 1370, 1376 (8th Cir. 1993)).

Because Julian and Campbell were aware of a report Sampson recently had attempted suicide, the dispositive question is "whether the measures taken were so inadequate as to be deliberately indifferent to the risk." Rellergert, 924 F.2d at 796. "The suicide [itself] is not probative of that question" because "tying the suicide to proof of deliberate indifference is tantamount to requiring jailers to provide suicide-proof institutions," and to ensure against suicide ever happening. Id. This is not the constitutional test. Instead, we must objectively "consider[] the measures taken in light of the practical limitations on jailers to prevent inmate suicides." Id. "Simply laying blame or fault and pointing out what might have been done is insufficient. The question is not whether the jailers did all they could have, but whether they did all the Constitution requires."[5] Id. at 797. "In evaluating an official's response to a known suicide risk, we should be cognizant of how serious the official knows the risk to be." Gregoire, 236 F.3d at 418.

---

[5]The dissent focuses heavily upon what Julian failed to do. See post 18 to 21. While what Julian did not do is relevant to the inquiry, our precedent is clear that, because jail officials such as Julian "did not have the benefit of twenty-twenty hindsight, as we do now," our primary focus is on "those precautionary measures which were undertaken." Liebe v. Norton, 157 F.3d 574, 578 (8th Cir. 1998).

-12-

An objective review of the evidence that is deferential to the verdict reveals the preventative measures taken by DCJ were not so inadequate as to constitute constitutional deliberate indifference. Sampson was detained at DCJ for fewer than twelve days. At no point during Sampson's incarceration before his successful suicide on August 10 did Sampson attempt suicide or claim to be suicidal. DCJ learned from Luckert that Sampson recently attempted suicide. In response, Julian, a registered nurse, twice saw and assessed Sampson and arranged for two appointments with DCJ's psychiatrist, Dr. Shoaib, including a session on the morning of Sampson's suicide. Julian also contacted Sampson's psychiatrist, Dr. O'Neill, to gather information about Sampson's condition. Julian received and reviewed Sampson's Norfolk Regional Center medical records and Dr. O'Neill's written synopsis report on Sampson. Julian responded in writing to each of Sampson's Requests for Medical Care and called Dr. Shoaib when she observed Sampson might be over-medicated. Despite the fact neither Julian nor Dr. Shoaib believed Sampson posed a serious risk to himself or others, DCJ kept Sampson on a thirty-minute suicide watch for the entirety of his detention. Even though Julian and Dr. Shoaib both were mistaken as to the risk of suicide, Julian's actions do not indicate Julian was apathetic or unconcerned with Sampson's condition. See Rellergert, 924 F.2d at 797 ("Indifference is apathy or unconcern.").

Construing the evidence in favor of the verdict, a reasonable jury could conclude Julian (1) negligently downgraded Sampson from a twenty-minute to a thirty-minute suicide watch; (2) failed to recognize or chose to ignore missed watches, although no missed watches occurred in the last four days of Sampson's detention; (3) failed to give Sampson one dose of prescribed medicine nine days before Sampson's suicide; (4) failed to act quickly or adequately upon Sampson's requests for a new cell, which was not readily available; (5) failed to implement a reduction in Sampson's prescribed medicine; and (6) failed to tell Dr. Shoaib about Luckert's report that Sampson had attempted suicide two weeks before his detention. While these failures may constitute poor judgment, negligence, or possibly even gross negligence, they do

-13-

not constitute deliberate indifference when viewed in the context of the "affirmative, deliberative steps" Julian took to prevent Sampson's suicide.  See Liebe, 157 F.3d at 578; see also Drake v. Koss, 445 F.3d 1038, 1042 (8th Cir. 2006) ("Deliberate indifference is akin to criminal recklessness and requires something more than mere negligent misconduct."); Gibson v. Weber, 433 F.3d 642, 646 (8th Cir. 2006) ("A showing of deliberate indifference is greater than gross negligence."); Choate, 7 F.3d at 1374 (explaining "deliberate indifference requires a highly culpable state of mind approaching actual intent"); see also Minix v. Canarecci, 597 F.3d 824, 828-29, 833 (7th Cir. 2010) (concluding a nurse's decision to remove a pretrial detainee from a suicide watch and from medical segregation despite knowing the inmate had twice attempted suicide, once in the previous month, did not show deliberate indifference, even if the decision showed poor judgment); but cf. Miller v. Tobiasz, No. 11-3233, ___ F.3d ___, ___, 2012 WL 1871649, at *1, 3-4 (7th Cir. May 24, 2012) (affirming, on interlocutory review, the district court's denial of a prison nurse's qualified-immunity-based motion to dismiss because the nurse's omission of information relating to an inmate's previous suicidal behavior on his jail intake form could constitute deliberate indifference).  Julian is entitled to qualified immunity.

As to Campbell, the evidence does not paint an impressive picture of his performance as DCJ director.  Campbell delegated to Julian significant responsibility for suicide intervention before DCJ formally trained her on relevant suicide policies and procedures.  Further, DCJ's actual practice in dealing with suicide intervention, for which Campbell was ultimately responsible, did not reflect DCJ's written policy.  DCJ allowed for a thirty-minute suicide watch, which provided less frequent observation than the watches detailed in Policy 12.4.  Also, DCJ did not keep a "suicide notebook," or maintain certain documentation procedures referenced in Policy 12.4. It would be reasonable to expect Policy 12.4 either to be followed or be modified to reflect DCJ's actual practices.  But these acts and omissions do not rise to the level of constitutional deliberate indifference.

Failure to follow written procedures does not constitute *per se* deliberate indifference. If this were so, such a rule would create an incentive for jails to keep their policies vague, or not formalize policies at all. And the record in this case does not show any evidence, nor are we aware of any precedent, from which jail officials would know a thirty-minute suicide watch—as opposed to a twenty-minute watch—is constitutionally impermissible, or that keeping a suicide notebook is constitutionally required. See generally Rellergert, 924 F.2d at 797 ("While we conclude that the law is clearly established that jailers must take measures to prevent inmate suicides once they know of the suicide risk, we cannot say that the law is established with any clarity as to what those measures must be.").

Under Campbell's management, DCJ had in place a practice where inmates at risk of committing suicide were identified, put on suicide watch, and given on-site medical attention by a registered nurse and, if necessary, a contract psychiatrist. See id. at 834 (recognizing that evidence casting doubt on a supervisor's performance did "not support an inference [the supervisor] condoned any unconstitutional practice by . . . employees"). As a result, Sampson remained on suicide watch throughout his detention and received medical attention from Julian and Dr. Shoaib, including on the same day as his suicide. Campbell is entitled to qualified immunity. See Gregoire, 236 F.3d at 418 ("Even if an official knows of a risk of suicide, and suicide does occur, the official is entitled to qualified immunity if he could reasonably believe that his response to the risk was not deliberately indifferent (or reckless) to that risk.").

### 2. Dodge County Liability

Finally, we must consider whether Dodge County is entitled to judgment as a matter of law. "A claim against a county is sustainable only where a constitutional violation has been committed pursuant to an official custom, policy, or practice." Johnson v. Blaukat, 453 F.3d 1108, 1114 (8th Cir. 2006) (citing Monell v. Dep't. of Soc. Servs. of N.Y.C., 436 U.S. 658, 690-91 (1978)). And this custom, policy, or practice must be "the 'moving force' behind the violation." Patzner v. Burkett, 779

F.2d 1363, 1367 (8th Cir. 1985) (quoting Monell, 436 U.S. at 694). "Moreover, the plaintiff must show not only that a policy or custom existed, and that it was causally related to the plaintiff's injury, but that the policy itself was unconstitutional." Id. at 1367 (citing Polk Cnty. v. Dodson, 454 U.S. 312, 326 (1981)).

The jury found Dodge County liable for failing to implement reasonable suicide prevention practices. Luckert highlights six claimed deficiencies in Dodge County's practices, which Luckert argues support the verdict: (1) "failure to treat inmates who have been identified as mentally ill"; (2) "failure to supervise staff"; (3) "failure to monitor and properly administer [Sampson's] medication"; (4) "inadequate recordkeeping"; (5) "falsification of [Sampson's] records"; and (6) "failure to investigate and correct deficiencies after [Sampson's] death." None of these alleged deficiencies demonstrate Dodge County had a custom, policy, or practice violating Sampson's constitutional rights and causing Sampson's suicide. Some of these claims are unsupported by the evidence, others did not contribute to causing Sampson's suicide, and some occurred after Sampson's suicide and thus are not probative to the issue at hand. See, e.g., Liebe, 157 F.3d at 580 (reasoning "focus on the County's lack of corrective actions after the suicide misses the mark . . . . [because] failure to act occurring after the date of suicide does not show that the County was deliberately indifferent to the risk of a suicide . . . nor does it show that the County tacitly authorized any unconstitutional conduct"). Luckert effectively has shown flaws in Dodge County's practices, but has not demonstrated the "continuing, widespread, persistent pattern of constitutional misconduct" necessary to find the county liable. Jenkins v. Cnty. of Hennepin, Minn., 557 F.3d 628, 634 (8th Cir. 2009) (quoting Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999) (internal quotation marks omitted)). "While we expect that jailers will learn from their failures in preventing suicide, they are not constitutionally liable for every failure, only those where they are deliberately indifferent to the risk of suicide." Gregoire, 236 F.3d at 419. Dodge County is entitled to judgment as a matter of law.

## III.  CONCLUSION

Because all of the appellants are entitled to judgment as a matter of law, it is unnecessary to address their remaining claims.  We reverse the district court's denial of the appellants' motion for judgment as a matter of law and vacate the district court's award to Luckert of compensatory and punitive damages, as well as attorney fees and costs.

BYE, Circuit Judge, dissenting.

I.

"Judgment as a matter of law is appropriate only when all of the evidence points one way and is susceptible of no reasonable inference sustaining the position of the nonmoving party."  Howard v. Mo. Bone & Joint Ctr., Inc., 615 F.3d 991, 995 (8th Cir. 2010) (internal quotation marks and citation omitted).  Thus, our only task in reviewing a district court's denial of a motion for judgment as a matter of law is "to determine whether there is sufficient evidence to support the jury's verdict."  Baker v. John Morell & Co., 382 F.3d 816, 828 (8th Cir. 2004) (internal quotation marks and citation omitted).  We "must not engage in a weighing or evaluation of the evidence." Id.  We must not consider questions of credibility.  Id.  This is the governing standard of review in this case—a standard the majority undeniably has chosen to ignore by concluding the evidence presented at trial is insufficient to overcome the appellants' qualified immunity defense.  Because I decline to join the majority in substituting its judgment for that of the jury, I respectfully dissent.

I am compelled to begin by emphasizing what I believe are the crucial aspects of the procedural posture in this case.  As the majority notes, the appellants first asserted the defense of qualified immunity at the summary judgment stage.  The district court denied their motion, finding genuine issues of material fact existed.  The appellants did not challenge the court's decision through an interlocutory appeal.

-17-

Rather, the case proceeded to trial where, after six days of evidence presentation, the jury found in favor of Luckert and against the appellants, who then moved for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure. The district court denied that motion as well, concluding the evidence presented at trial, when viewed in the light most favorable to the verdict, "fully support[ed] the jury's finding of deliberate indifference to serious medical needs." Order Den. Mot. J. as a Matter of Law, Nov. 10, 2010, at 4. It is the district court's denial of their post-verdict motion which the appellants are now challenging on appeal. The United States Supreme Court has been clear on what the governing standard of review at this stage of the proceedings must be. As the Court recently explained, when "defendants continue to urge qualified immunity [in a post-verdict motion], the decisive question . . . is whether the evidence favoring the party seeking relief is legally sufficient to overcome the defense." Ortiz v. Jordan, 131 S.Ct. 884, 889 (2011) (citing Fed. R. Civ. P. 50). In reviewing the appellants' challenge, therefore, we are bound to consider only whether the evidence presented at trial is sufficient to overcome their defense of qualified immunity. Based on the record before us, I am convinced the evidence is not only sufficient, it is indeed, overwhelming.

II.

A. **Julian.**

Purporting to be conducting "[a]n objective review of the evidence that is deferential to the verdict[,]" ante at 13, the majority concludes no reasonable jury could have found Julian's conduct was the equivalent of deliberate indifference. However, allow me to offer this verdict-deferential recitation of the evidence regarding Julian. Despite her knowledge as to Sampson having attempted to commit suicide two weeks prior and being mentally unstable based on her own personal observation, Julian downgraded Sampson's suicide watch from twenty to thirty minutes. Policy 12.4, however, provides visual checks of inmates on suicide watch,

-18-

such as Sampson, must be conducted at intervals no longer than twenty minutes. In fact, Policy 12.4 does not even allow visual observation of suicidal inmates at intervals longer than twenty minutes. Yet, Julian not only downgraded, but also kept Sampson on thirty-minute suicide watches until the very instant he actually committed suicide. Policy 12.4 also required Julian to consult with a shift supervisor before downgrading an inmate's suicide watch.[6] Julian failed to consult anyone. Policy 12.4 required Julian to observe and assess inmates on suicide watch on a daily basis. The record here clearly concludes Julian failed to personally observe Sampson for eight entire days.

In addition, the following is what else Julian failed to do. She failed to report DCJ staff did not administer Sampson his medications on at least one occasion and, more importantly, missed his suicide watches on a number of occasions. As the majority notes, albeit in a footnote, DCJ log sheets clearly showed Sampson had one missed suicide watch per day for the period between August 2 and August 4, and five missed suicide watches again on August 5 as well as again on August 6. Julian knew about these missed watches. She did absolutely nothing to correct them.

Julian also failed to adjust Sampson's medications as instructed and directed by Dr. Shoiab. The record shows she continued to administer Cymbalta (an anti-depressant) and Klonopin (an anti-anxiety medication) to Sampson after Dr. Shoiab ordered her to discontinue these medications. At the same time, she did not reduce the dosage of Sampson's anti-psychotic medication and did not administer Lunesta (a

---

[6]Policy 12.4(D)(3) provides:

Either the Nurse or the on-duty Shift Supervisor may place an individual on a suicide level or upgrade that level as necessary. However, the nurse and the shift supervisor *must agree to downgrade the suicide level* or remove the inmate form a suicide level altogether . . . .

(Emphasis added.)

sleep aid) as directed by Dr. Shoiab. In addition, Julian never informed Dr. Shoiab about her failure to reduce Sampson's prescribed medications—a fact deeply troublesome because of Dr. Shoiab's testimony as to his assumption the medications and dosages had been changed as he directed when ordering further adjustments to Sampson's prescriptions on August 10.

In finding Julian was deliberately indifferent to Sampson's serious medical needs, the jury also had the following evidence to consider. Julian did not tell Dr. Shoiab Sampson had attempted to commit suicide as recently as two weeks prior. She did not communicate to Dr. Shoiab any of Sampson's requests for solitary confinement, his increasingly frantic notes, or his refusal to eat. The following is the type of information Julian found too insignificant, or perhaps too irrelevant, to pass on to Sampson's treating physician. On August 6, Sampson submitted a request for medical care, stating: "Need to be transferred to Norfolk Regional Center to Dr. Stephen Oneil [sic] or I will die in here. My head is killing me. These meds are making me sick and confused." During that same day, Sampson announced he would stop eating. The next day, August 7, Sampson again requested a "safety cell or solitary confinement. NO TV. I wish to be alone." He further wrote: "The T.V. makes me go crazy please move me for the last time, im gonna loose [sic] it, no T.V. please." Later that day, Sampson submitted another medical request form, pleading: "Dr. Mohamed please put me in isolation with no TV by myself. The T.V. is making me go insane, put me in solitary confinement A.S.A.P. please. Need medication . . . ." Julian did not communicate any of these pleas to Dr. Shoiab. She simply wrote a cryptic note to Sampson: "No cells like that available. Sorry. We are full." As a result, Sampson remained in the general population, per Julian's directions, where on August 10 he hung himself from the air vent utilizing a bed sheet. See Coleman v. Parkman, 349 F.3d 534, 540 (8th Cir. 2003) (stating the placement of a suicidal inmate in a cell with exposed bars and a bed sheet is an unreasonable response to the inmate's serious medical needs, which violates the "common sense rule").

-20-

Based on the record before us, it cannot be said the evidence presented at trial is insufficient to overcome Julian's qualified immunity defense. While a different jury may have found Julian's conduct did not rise to the level of deliberate indifference, I cannot say no reasonable jury could have found Julian's actions and inactions showed she was deliberately indifferent to Sampson's serious medical needs. See Ortiz, 131 S.Ct. at 889; Howard, 615 F.3d at 995 (stating that on appeal of a denial of a motion for judgment as a matter of law, "we must give great deference to the jury's verdict" and should overturn only if the evidence presented at trial is "susceptible of no reasonable inference sustaining the [verdict]") (internal quotation marks omitted). I would therefore affirm the district court's denial of Julian's motion for judgment as a matter of law.

### B.    Campbell.

"Supervisors, in addition to being liable for their own actions, are liable when their corrective inaction amounts to 'deliberate indifference' or to 'tacit authorization' of the violative practices." Howard v. Adkison, 887 F.2d 134, 137 (8th Cir. 1989). The majority concludes that while "the evidence does not paint an impressive picture of [Campbell's] performance as DCJ director . . . [his] acts and omissions do not rise to the level of constitutional deliberate indifference." Ante at 14-15. Construed in the light most favorable to the jury verdict, however, the evidence presented at trial does indeed show otherwise.

The evidence convincingly shows Campbell knew Sampson had attempted to commit suicide just two weeks prior and recorded this attempt in the "passbook." A grand jury investigating another inmate's suicide in 2001, however, had determined the "passbook" was an inadequate way of communicating potential problems with inmates among DCJ staff. Moreover, a "passbook" was not what Policy 12.4 required of Campbell and his staff. Rather, Policy 12.4 required the completion of a "suicide level form" upon a determination an inmate is potentially suicidal—a form, which was

to be placed in a "suicide notebook" and was to be updated on a daily basis.[7] Yet, the evidence shows that during Campbell's eleven-year tenure as DCJ's director, he never enforced, or even knew of, these Policy 12.4 requirements. In fact, as the evidence at trial clearly revealed, in November 2008—over two years after Sampson's suicide—Campbell still did not know what a "suicide notebook" was. As a result of Campbell's failure to enforce these provisions of Policy 12.4, DCJ staff did not follow the proper procedures relating to suicide intervention. In addition, while Campbell knew Policy 12.4 authorizes only ten- and twenty-minute watches for suicidal inmates, he tacitly authorized his staff members to administer thirty-minute watches, in direct violation of Policy 12.4. Campbell was also aware that between the years 2000 and 2006 twenty-one inmates had attempted suicide, three of whom were successful. Yet, he failed to make a single revision to DCJ's suicide prevention policy because, in his own words, he was "just not . . . able to get around to rewriting that one." Not only was he unable "to get around to rewriting" Policy 12.4, he was also unable to explain during the trial how, if at all, his staff received training in suicide prevention.

The jury also learned as to one of the successful suicide attempts prior to Sampson being executed in the exact manner as was Sampson's suicide—the inmate hung himself from his cell's air vent with a bed sheet. Yet, Campbell took no corrective measures to ensure the safety of DCJ's vent system. He knew the safety cell—the only cell designed to be suicide resistant—was unavailable from August 3 to August 10, the day on which Sampson committed suicide. Yet, he offered no substitutes for a suicide-resistant cell, effectively forcing Sampson to remain in a general population cell where he had access to both a bed sheet and an air vent. See

_____

[7]Policy 12.4 provides that "[i]f correctional personnel or another staff person is aware of an inmate who has made a suicide threat/gesture or if there is a reason to believe that an inmate is potentially suicidal," the staff must notify the shift supervisor immediately. The responsibility to place the inmate on an appropriate suicide watch, fill out the form, place it in the suicide notebook, and update it on a daily basis lies with either the nurse or the shift supervisor.

Turney v. Waterbury, 375 F.3d 756, 761 (8th Cir. 2004) (concluding prison official's actions exhibited deliberate indifference because, among other facts, the official failed to investigate an earlier suicide attempt and placed the inmate "in a cell alone with a bed sheet and exposed ceiling bars").

Based on this evidence, a reasonable jury could have concluded Campbell was deliberately indifferent to the needs of suicidal inmates, including the serious medical needs of Sampson. Accordingly, because the evidence presented at trial was sufficient to overcome Campbell's qualified immunity defense, I would also affirm the district court's denial of his motion for judgment as a matter of law. See Ortiz, 131 S.Ct. at 889; Hathaway v. Runyon, 132 F.3d 1214, 1220 (8th Cir. 1997) ("Judgment as a matter of law is proper only when there is a complete absence of probative facts to support the conclusion reached so that no reasonable juror could have found for the nonmoving party.") (internal quotation marks and citation omitted).

### C. Dodge County.

"A plaintiff may establish municipal liability under § 1983 by proving that his or her constitutional rights were violated by an 'action pursuant to official municipal policy' or misconduct so pervasive among non-policymaking employees of the municipality 'as to constitute a "custom or usage: with the force of law.'" Ware v. Jackson Cnty., Mo., 150 F.3d 873, 880 (8th Cir. 1998) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978)). "Custom or usage" may be shown by "[t]he existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees." Ware, 150 F.3d at 880. The majority concludes Dodge County is entitled to judgment as a matter of law because the evidence presented at trial is insufficient to demonstrate the "'continuing, widespread, persistent pattern of constitutional misconduct' necessary to find the county liable." Ante at 16 (quoting Jenkins v. Cnty. of Hennepin, Minn., 557 F.3d 628, 634 (8th Cir. 2009)). Based on the evidence before it, however, the jury in this

case was entitled to infer that a pattern of constitutional misconduct existed and was allowed to flourish ad infinitum.

Without question, Dodge County's Corrections Policy & Procedure Manual does include a written Suicide Intervention Policy (Policy 12.4). The record shows, however, that in a six-year span under this policy, there were three suicides and twenty-one suicide attempts. The record also clearly demonstrates neither the County nor its employees took any action to improve or revise the policy. On the contrary, despite the high number of suicide attempts and actual suicides, Policy 12.4 has not been revised since it was first implemented going all the way back to 1994. More importantly, certain provisions of Policy 12.4 were never followed or enforced. For instance, both Campbell and Julian admitted DCJ employees did not follow the three suicide levels identified in Policy 12.4 as: (1) Alert, which requires close observation and placement in a safety cell for inmates who have recently attempted to commit suicide, such as Sampson; (2) Warning, which requires visual checks no more than ten minutes apart, possible restriction of items in inmate's cell, and possible isolation of inmates who display strong signs indicating suicide or who have a history of attempting suicide; and (3) Watch, which requires visual checks in intervals no longer than twenty minutes. Additionally, Campbell did not enforce, and DCJ employees did not follow, Policy 12.4's directives for the completion a "suicide level form" for suicidal inmates, the maintenance of a "suicide notebook," and the performance or recording of daily assessments for inmates placed on suicide watch. In fact, Campbell did not even know whether or how new employees receive training on Policy 12.4.

"[T]he existence of written policies of a defendant are of no moment in the face of evidence that such policies are neither followed nor enforced." Ware, 150 F.3d at 882. The evidence presented at trial unequivocally established that essential provisions of Policy 12.4, such as establishing the appropriate level of suicide watch and maintaining proper documentation for suicidal inmates, were neither followed by DCJ employees nor enforced by its director, Campbell, for more than a decade. Based

-24-

on this evidence, a reasonable, conscientious jury did infer a pattern of unconstitutional misconduct so "continuing, widespread, [and] persistent" on the part of Dodge County's employees "as to constitute a 'custom or usage' with the force of law." Id. at 880. Accordingly, the evidence was clearly sufficient to support the jury's finding Dodge County had "a policy or custom of failing to implement reasonable suicide prevention practices"—a finding which precludes the County from asserting the qualified immunity defense. The district court therefore properly denied the County's motion for judgment as a matter of law.

## III.

Because I decline to substitute this court's judgment for that of the jury, I must respectfully dissent.

_____